EXHIBIT 1

RECEIVED

COPY

2017 JUL 25 PM 2: 30

CITY OF TEMPE
Y CLERK'S OFFICE

JUL 1 9 2017

MICHAEL K. JEANES, CLERK
R. MALLARD
DEPUTY CLERK



1   David W. Dow (#007377)
    Jennifer L. Levine (#033071)
2   DOW LAW OFFICE
    3104 E. Camelback #281
3   Phoenix, Arizona 85016
    Office: 480.776.5039
4   Fax: 480.945.0553
    Ddowlaw1@gmail.com
5   Jlevine@ddowlaw.com
6   *Attorneys for Plaintiff*

*Server; Russ Hoffman*
*Badge # mc 7486*

7   **SUPERIOR COURT OF ARIZONA**
    **MARICOPA COUNTY**

8

9   SARAH COLEMAN, individually and as a      Case No. CV2017-010294
10  Personal Representative of the Estate of
    Dalvin Hollins, deceased,                 **COMPLAINT**
11
12  Plaintiff,

13  v.

14  CITY OF TEMPE, a municipal entity;
15  EDWARD OUIMETTE, an individual,
    acting under the color of law; JOHN DOES
16  I-V, an individual(s), acting under the color
    of law, and JANE DOES I-V, an
17  individual(s), acting under the color of law;
18  XYZ CORPORATIONS; ABC LLCs.

19  Defendants

20      Plaintiff Sarah Coleman and the Estate of Dalvin Hollins, hereby allege as
21
22  follows:

23  1.   Plaintiff Sarah Coleman (sometimes "Plaintiff" or "Sarah") is and was at all

24       relevant times a resident of Maricopa County, Arizona. She is the surviving

25       mother of Dalvin Hollins, deceased, who died on July 27, 2016 from a fatal

26

gunshot wound caused by the actions and/or inactions of Defendant Edward Ouimette ("Defendant Ouimette") of the Tempe Police Department ("TPD") and the actions and/or inactions of the Tempe Police Department.

2. Plaintiff brings claims arising from the violation of Dalvin Hollins' constitutional rights, as Personal Representation of the Estate of Dalvin Hollins, pursuant to her appointment as such on May 15, 2017 by Maricopa County Superior Court. Arizona law, specifically A.R.S. § 14-3110, authorizes a survival action by Plaintiff as Personal Representative of her son's estate. She also brings other claims on behalf of the Estate of Dalvin Hollins arising under Arizona or Federal law.

3. Plaintiff brings other claims, including violation of her individual constitutional rights as well as the deceased, Dalvin Hollins' constitutional rights, under A.R.S. §12-612 as to wrongful death claims, and pursuant to Federal law, 42 U.S.C. § 1983, in her individual capacity as a surviving mother of Dalvin Hollins. She also brings other claims arising under Arizona or Federal law.

4. Defendant Ouimette, at all times relevant to this Complaint, was a duly appointed and acting lieutenant of the TPD, acting under the color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Tempe and TPD. He is sued in his individual capacity.

- 2 -

5. Defendant City of Tempe is a municipal and jural entity duly organized under the laws of the State of Arizona and was the employer of the individual Defendant Ouimette, and at all times relevant to this Complaint responsible for the policies, practices, customs and procedures of the TPD. TPD is a department of the City of Tempe.

6. Defendant(s) John Doe(s) and/or Jane Doe(s) are yet unknown police officers who at all times relevant to this Complaint, were acting under the color of law and within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Tempe and TPD and are being sued in an individual capacity and may be liable to Plaintiff.

7. Defendant(s) XYZ Corporations and ABC LLC's are yet unknown LLC's and/or corporations and may be liable to Plaintiff.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the parties of this action. The amount of damages sought by Plaintiff exceeds the minimum jurisdictional amount established for filing in this Court pursuant to the Arizona Constitution and common law.

9. Venue is proper in this Court because the events that gave rise to this lawsuit occurred in Maricopa County.

10. A proper and timely Notice of Claim/Administrative Demand pursuant to the laws of the State of Arizona was served upon each named Defendant, and over sixty (60) days has passed since that service. A.R.S. §12-821.01.

## FACTUAL ALLEGATIONS

11. On or about July 27, 2016 at approximately 9:29 a.m., while Defendant Ouimette, a Caucasian male, worked as an on-duty Tempe Police Lieutenant, he shot and killed Dalvin Hollins ("Dalvin"), a nineteen-year-old black male.

12. Defendant Ouimette shot Dalvin in the back. The direction of the shot was listed as back to front, left to right and slightly downward. Dalvin was not wearing a shirt and was not carrying a weapon.

13. Defendant Ouimette used unlawful, unreasonable and excessive force and discharged a firearm at Dalvin. Upon information and belief, Defendant Ouimette was at least twenty-two (22) to seventy-five (75) feet away from Dalvin when he fatally shot Dalvin, who was unarmed, in the back.

### Walgreens

14. At approximately 9:07 a.m., an alleged robbery that occurred at a Walgreens located on McClintock and Guadalupe was broadcasted over the police radio.

15. According to the police report, officers responded to the Walgreens call and advised over the radio that no one had seen a gun.

16. According to Defendant Ouimette, he heard over radio traffic that "a gun was not seen."

17. According to the police report, the suspect was described many ways. One described the suspect as a black male, approximately 6'0", thin build, wearing all

black, long black hood and a dark long sleeve shirt. He was also wearing a dark colored satchel style bag.

18. Another witness described him as black, 5'08, 5'10, medium to slender build, had a short afro, black and gray hoodie or long sleeve shirt, black pants, black sneakers, and had a black messenger bag.

19. A different witness described him as black male, 6'01, slim build, approximately 160 lbs., wearing all black with gray sweat pants, ski mask and a lap top bag.

### Officer Spencer's Statement

20. According to the police report, Officer Spencer traveled southbound on Rural Road approaching Guadalupe and allegedly spotted a black male, who was not wearing a shirt, on Rural and Guadalupe. This person did not exactly match the description of the suspect. Officer Spencer drove around and watched who was later determined to be Dalvin Hollins, yet Officer Spencer did not turn on his Body Worn Camera ("BWC").

21. According to Officer Spencer, Officer Spencer got out of his vehicle and attempted to speak with Dalvin. Officer Spencer still did not activate his BWC.

22. According to the police report, Officer Spencer asked to speak to Dalvin, to which Dalvin responded "Why?"

23. According to Officer Spencer, at that point Defendant Ouimette's patrol vehicle with emergency lights activated appeared in the parking lot traveling north and a chase ensued.

24. Because no gun existed, Officer Spencer did not report that Dalvin had a gun.

25. According to Officer Spencer, officers at Walgreens indicated that no one saw a gun.

26. According to Officer Spencer, Dalvin did not do anything threatening.

## Defendant Ouimette's Statement

27. According to the police report, prior to his contact with Officer Spencer and Dalvin, Defendant Ouimette, while in his police vehicle, learned that nineteen minutes had passed from the Walgreens incident and remembered thinking that the suspect "could be anywhere."

28. According to Defendant Ouimette, he recalled someone providing radio information that "a gun was not seen."

29. Defendant Ouimette appeared in the northeast parking area of the Jack in the Box restaurant and claims he saw Officer Spencer and Dalvin. According to Defendant Ouimette, Dalvin ran north and Officer Spencer began chasing Dalvin. Defendant Ouimette did not activate his BWC.

30. According to Defendant Ouimette, Defendant Ouimette attempted to slow down Dalvin with his vehicle but Dalvin ran around the vehicle, potentially coming into contact with his police vehicle and placing "both" of "his hands" possibly to "balance himself to push himself off" so he could "run around the front of" his "vehicle."

31. According to Officer Spencer, however, there was no contact with Defendant Ouimette's vehicle and no latent prints were found on the vehicle.

32. Contrary to Officer Spencer's statement that Defendant Ouimette's lights were already activated, Defendant Ouimette claims that he now activated his police lights and sirens.

33. Defendant Ouimette, who while driving had more than enough time to turn on his BWC, violated TPD policies and procedures or was not properly trained to do so and failed to turn on his BWC.

34. Upon Defendant Ouimette's own admission, it "never crossed" his "mind" to turn on the BWC and added that the training for the BWC does not involve "how to use a camera under stress and if you're not out there turning it on every day when you're making contact, you just don't think about it."

35. According to the police report, Defendant Ouimette chased Dalvin in his vehicle until he "slammed" on his brakes near the Westchester Senior Living Center and then chased Dalvin on foot.

### The Homicide

36. Contrary to witness statements, Defendant Ouimette claims that he was running east to west, parallel to Dalvin. Defendant Ouimette claims that Dalvin was running on the right side of Defendant Ouimette and claims that Defendant Ouimette could only see the left side of Dalvin's body.

37. Witnesses, however, stated that Defendant Ouimette was running behind Dalvin, not parallel, which would allow Defendant to see both sides of Dalvin's body and is consistent with the location of the shell casing, and Defendant Ouimette and Dalvin having been 22 – 75 feet away from each other at the time of the shooting.

38. Despite not even being sure that Dalvin was the robbery suspect and in no present danger, Defendant Ouimette claims that he stated: "Stop or I'm gonna shoot you."

39. According to Defendant Ouimette, in response to his alleged verbal commands and while Defendant Ouimette claims that he ran parallel to Dalvin, Dalvin turned his head towards Defendant Ouimette, looked at Defendant Ouimette and turned the right side of his body over the left side of his body and extended his right hand out toward Defendant Ouimette with what Defendant Ouimette said was a "black semi-automatic handgun."

40. Defendant Ouimette failed to recognize what a gun looks like or was inadequately trained on how to recognize a gun.

41. Despite the fact that no gun existed, Defendant Ouimette responded by pointing his duty firearm at Dalvin, firing one time at the shirtless and gunless teenager. Defendant Ouimette claims that he fell to the ground in order to get out of the way of this nonexistent fictitious gun.

42. The bullet direction was listed as back to front, left to right and slightly downward.

43. According to Defendant Ouimette, after he shot Dalvin in the back, he did not consider Dalvin an "immediate threat" and did not fire any additional times.

44. After being shot in the back, Dalvin somehow managed to stagger into a maintenance shed, where two witnesses, Marlon Cruz and Luis Flores, saw Dalvin bleeding from his chest and possibly the shoulder.

45. According to the police report, at approximately 9:29 a.m., Defendant Ouimette advised "shots fired" over the police radio.

46. A witness, Walter Ramos, who immediately prior to the shooting was running behind Defendant Ouimette and Dalvin, never heard any verbal commands nor did he hear any verbal exchanges between Defendant Ouimette and Dalvin. Mr. Ramos never saw a physical altercation between Dalvin and Defendant Ouimette and stated that he only saw something that looked like a t-shirt in Dalvin's hand. Mr. Ramos stated that he did not see a firearm in Dalvin's hand.

47. Defendant Ouimette knew that Dalvin was hit by the bullet as Defendant Ouimette stated Dalvin "flinched a little bit" immediately after firing the weapon and subsequently Defendant Ouimette sent a message to someone that he shot someone.

48. At 9:34 a.m., which is only five minutes after the fatal shooting, Defendant Ouimette asked Sgt. T. Bunson if Dalvin had a gunshot wound, to which Sgt. Bunson responded "yeah."

49. Despite the fact that Dalvin was not a threat to any officers, despite no object ever being found that even remotely resembled a gun, despite Defendant Ouimette having followed Dalvin in his car before the foot pursuit and having seen both of

- 9 -

Dalvin's hands without a gun, and despite officers broadcasting that no gun was ever seen at Walgreens, Defendant Ouimette claims he specifically saw a "black semi-automatic handgun" in his hand. This gun, however, never existed.

50. There was never physical contact between Dalvin and Defendant Ouimette.

51. Dalvin never threatened to use physical force upon Defendant Ouimette nor did he show any signs of potentially using force.

52. Defendant Ouimette, with deliberate indifference to Dalvin's life and in violation of established law regarding appropriate law enforcement actions as to deadly force, unlawfully shot Dalvin in the back.

53. Defendant Ouimette used lethal deadly force on Dalvin when he had available to him non-deadly force options. Instead of shooting Dalvin in the back, Defendant Ouimette had reasonably available to him the option of establishing a perimeter to stop Dalvin from running, especially considering Officer Spencer and other officers were very close to Westchester Senior Living Center at the time of the shooting. Defendant Ouimette also had the option of discharging from his firearm toward an area of Dalvin's body (e.g. his legs) that would have lessened the chance of a fatality occurring or simply using a Taser, pepper spray or other less deadly options to stop him from running.

54. Defendant Ouimette could not have reasonably believed that Dalvin was using or might use deadly force against him. It was impossible for Defendant Ouimette to have seen a black semi-automatic handgun as Dalvin did not have a weapon and

witnesses to the chase stated that they never saw a weapon. Defendant Ouimette also stated that he saw Dalvin's hands while Defendant Ouimette was in his police vehicle and never saw a black semi-automatic handgun.

55. Because Dalvin did not have a weapon and did not threaten Defendant Ouimette, deadly force was not necessary to defend himself. In fact, Defendant Ouimette did not even know if Dalvin was the person who committed the Walgreens robbery and he after he saw both of Dalvin's hands without a weapon, Defendant Ouimette could have backed off and then continued to follow Dalvin while he waited for others, who upon information and belief, were not far away.

56. Less than lethal force would have been wholly adequate to contain the situation, yet Defendant Ouimette chose to use the most severe, intrusive force possible.

57. In fact, no force was necessary as Dalvin did not have a weapon and there was no definitive information that Dalvin was involved in any illegal activity.

58. Defendant Ouimette, with deliberate indifference and in violation of established law regarding appropriate law enforcement actions in regards to use of force and detainment, escalated and provoked a situation and then used objectively unreasonable, deadly physical force against Dalvin.

59. Instead of continuing to pursue Dalvin or seeking assistance in contacting Dalvin, Defendant Ouimette shot and killed an unarmed teenager in the back who was at least approximately twenty-two (22) to seventy-five (75) feet ahead of Defendant Ouimette.

60. Defendant Ouimette's failure to consider, and/or deliberate decision to not ready or employ non-force and non-lethal force options that would have been effective in resolving the situation, when the circumstances afforded him sufficient time to do so, amounts to an intent to cause serious injury to Dalvin.

61. When he directed deadly force at Dalvin's person and committed those acts and/or omissions set forth above, Defendant Ouimette knew, and a reasonable person would have concluded, that so proceeding created a risk of harm to Dalvin that could have been avoided by taking basic steps as already described herein.

62. The foregoing acts and omissions of Defendant Ouimette were deliberate, reckless, wanton, and/or involved callous indifference to Dalvin's federally protected rights and rights under the State of Arizona

### Failure to Provide Medical Treatment

63. Despite the fact the TPD and Defendant Ouimette knew that Dalvin was shot, they failed to enter the maintenance shed until at least 10:35 a.m. TPD and Defendant Ouimette failed to render aid to Dalvin and precluded others from rendering aid.

64. The actions/inactions of TPD and Defendant Ouimette increased the probability and possibility that Dalvin would die.

65. According to Mr. Cruz, when asked by the officers whether Dalvin could get out of the shed, Mr. Cruz stated that Dalvin "could only get out through the one door," which was the door Dalvin had entered and that opened to the parking lot, not to the facility.

- 12 -

66. At least one hour and six minutes passed between Defendant Ouimette shooting Dalvin and SWAT finally entering the maintenance shed. Although many alternatives existed to merely waiting for Dalvin to die in the shed, including but not limited to use of dogs, tear gas or percussion grenades, TPD and Defendant Ouimette chose to let Dalvin slowly and painfully die. When SWAT finally entered, Dalvin was deceased.

67. According to the medical examiner, Dr. Alisha Bogus, Davlin's lung collapsed but it was not immediately fatal. Upon information and belief, Dalvin died from the shooting and the failure to obtain medical treatment.

68. At the time of the shooting, Dalvin was not an immediate threat to the TPD officers or the public. In fact, Defendant Ouimette did not consider Dalvin an "immediate threat" to him, therefore, he did not fire any additional times.

69. Upon information and belief, people heard Dalvin screaming for help and nurses requested that they be allowed inside the shed to help. TPD, however, refused to allow them inside. TPD knew that Dalvin was shot and should have provided Dalvin with the requisite medical treatment. At minimum, TPD could have sent a police canine, a negotiator to determine whether Dalvin would come out voluntarily, initiate tear gas, or some other means into the shed to check on Dalvin. Despite the many options, TPD failed to check on Dalvin's well-being.

70. In addition to Defendant Ouimette, several yet unknown officers and/or supervisors were on the scene and intentionally or recklessly failed to obtain medical treatment

- 13 -

for Dalvin based on policy, procedures, directives or decisions, and were thus, deliberately indifferent to Dalvin's medical needs.

71. At all times relevant to this action, the City of Tempe was further responsible for the hiring, training, supervision, monitoring and disciplining police officers including Defendant Ouimette.

72. Defendant Ouimette and the other TPD officers on scene had either not received any training or received inadequate training from TPD and/or the City of Tempe regarding the appropriate use and amount of force, approaching persons of interest, and/or addressing how to deal with an injured person who has posed no danger to any officer.

73. At all times relevant to this action, the City of Tempe had in effect and was responsible for the policies and procedures provided to Defendant Ouimette in the actions taken relating to Dalvin's death. These policies and/or training deficiencies amounted to deliberate indifference to the rights of Dalvin, with whom Defendant Ouimette and others at the scene came into contact with or intentionally failed to contact to provide medical care.

74. As a direct and proximate result of Officer Ouimette's failure to turn on his BWC, the incident was not recorded and crucial substantive evidence was lost.

75. As a result of the foregoing, Dalvin was shot, killed, suffered pain and suffering and sustained other damages as more fully set forth herein.

76. Plaintiff Sarah Coleman, by reason of Dalvin's death, has suffered pecuniary and non-pecuniary damages as more fully set forth herein.

## SARAH COLEMAN

77. Sarah gave birth to Dalvin on August 20, 1996 and was very close to Dalvin.

78. Sarah had two sons: Dalvin and Devin.

79. Dalvin lived with Sarah and Sarah considered Dalvin her "right hand man."

80. On July 27, 2016, Sarah received the unfathomable news that her son, Dalvin, may have been killed. She went to Westchester Senior Living Center.

81. Sarah entered the shed and felt an overwhelming sense of loss and devastation.

82. As a result of Defendants' actions and/or inactions, Sarah suffered severe emotional distress, which will exist for the rest of her life. Sarah is grieving as the loss of a child is inconsolable. She has attempted to find solace in her faith through the Bible and church. Sarah's days are very hard knowing that Dalvin will never come home.

83. There is no worse feeling than a parent losing their child and because of Defendants Ouimette and TPD, Sarah will spend the rest of her life enduring an unfathomable pain.

84. She will not be able to have grandchildren from her first-born son.

85. Sarah, by reason of Dalvin's death, has suffered pecuniary and non-pecuniary losses and damages.

86. Sarah sustained injuries including the loss of love, affection, companionship of her son, Dalvin. Sarah also suffered severe personal anguish and overall suffering.

- 15 -

87. As a result of Dalvin's death, Sarah lost all future economic care and support and a loss of companionship and consortium.

## ESTATE OF DALVIN HOLLINS

88. Dalvin Hollins was 19-years-old when Defendant Ouimette callously and recklessly shot this unarmed teenager in the back.

89. After Dalvin was shot, in fear for his life, Dalvin managed to stagger into a shed.

90. Upon information and belief, Dalvin was screaming for help; it never came.

91. Nurses requested access to the shed to help, however, TPD refused to allow them access to the shed.

92. No one entered the shed to provide Dalvin with potential lifesaving medical care for at least one hour and six minutes.

93. Dalvin remained in the shed alone, most certainly afraid and in significant pain until he was pronounced deceased at least one hour and six minutes after Defendant Ouimette callously shot Dalvin in the back.

## PLAINTIFF'S CLAIMS

**COUNT I – Federal Civil Rights Claims Under 42 U.S.C. § 1983 (Violation of Fourteenth Amendment Substantive Due Process) – *By Plaintiff individually, against Defendant Ouimette***

94. Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

95. Plaintiff Sarah had a liberty interest in the companionship of her adult child, Dalvin.

96. The circumstances of Defendant Ouimette's encounter with Dalvin provided him with an opportunity and time to deliberate regarding various non-deadly options as described herein that would not have resulted in the use of deadly force or likely any force at all, and Dalvin's death.

97. The legitimate objective of Defendant Ouimette's law enforcement encounter with Dalvin was to question him in regards to an alleged robbery.

98. Defendant Ouimette, acting with purpose to cause harm to Dalvin unrelated to the object of his law enforcement encounter with Dalvin, fatally shot Dalvin.

99. Since no gun existed and witnesses stated that they did not see a weapon, it was impossible for Defendant Ouimette to have specifically seen a black, semi-automatic handgun in Dalvin's hand. Therefore, Defendant Ouimette could not have possibly thought that Dalvin would use deadly force upon Defendant Ouimette at the time that Defendant Ouimette shot Dalvin.

100. Defendant Ouimette acted with deliberate or reckless indifference towards Dalvin's life when Defendant Ouimette unjustifiably shot Dalvin in the back, which caused his death.

101. As a direct and proximate result of Defendant Ouimette's conduct, Dalvin died a slow and painful death.

102. Plaintiff's substantive due process rights were violated and Plaintiff sustained damages as fully set forth herein.

**COUNT II – Federal Civil Rights Claims Under 42 U.S.C. § 1983 (Violation of**

**Fourteenth Amendment Substantive Due Process) – *By Plaintiff on behalf of the Estate against Defendant Ouimette***

103. Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

104. Plaintiff Dalvin had a liberty interest in his life and medical treatment after he was shot.

105. The circumstances of Defendant Ouimette's encounter with Dalvin provided him with an opportunity and time to deliberate regarding various options as described herein, that would not have resulted in the use of deadly force or likely any force at all, and Dalvin's death.

106. The legitimate objective of Defendant Ouimette's law enforcement encounter with Dalvin was to question him in regards to an alleged robbery.

107. Defendant Ouimette, acting with purpose to cause harm to Dalvin unrelated to the object of his law enforcement encounter with Dalvin, fatally shot Dalvin.

108. Since no gun existed and witnesses stated that they never saw a weapon, it was impossible for Defendant Ouimette to have specifically seen a black, semi-automatic handgun in Dalvin's hand. Therefore, Defendant Ouimette could not have possibly thought that Dalvin would use deadly force upon Defendant Ouimette at the time that Defendant Ouimette shot Dalvin.

109. Defendant Ouimette acted with deliberate or reckless indifference towards Dalvin's life when Defendant Ouimette shot Dalvin in the back and left him for death without rendering medical care, which caused his death.

110. As a direct and proximate result of Defendant Ouimette's conduct, Dalvin died.

111. Dalvin's substantive due process rights were violated and his Estate sustained damages as fully set forth herein.

**COUNT III – Arizona law claim for Wrongful Death pursuant to A.R.S. 12-612 - By** *Plaintiff, individually, against Defendant Ouimette and City of Tempe*

112. Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

113. At all relevant times, Defendant Ouimette was acting within the course and scope of employment with the Defendant City of Tempe and the City of Tempe is therefore vicariously liable for the acts and omissions of Defendant Ouimette.

114. It was the duty of Defendant Ouimette to exercise reasonable care in his interactions with Dalvin Hollins.

115. Defendant Ouimette breached that duty, and was ordinarily and grossly negligent when with a conscious indifference towards Dalvin's life, shot and killed Dalvin who was not a threat, did not have a black semi-automatic weapon, and who was at least twenty-two to seventy-five feet away from Defendant Ouimette at the time of the shooting. Defendant Ouimette also breached his duty when he failed to render Dalvin medical treatment after Defendant Ouimette shot Dalvin in the back.

- 19 -

116. The conduct also constituted an assault and battery under Arizona law. Defendant Ouimette wrongfully and unconstitutionally killed Dalvin when Defendant Ouimette chased Dalvin, and from a distance of approximately twenty-two to seventy-five feet behind Dalvin, shot his firearm, which struck Dalvin in the back.

117. Defendant City of Tempe and TPD owed Dalvin a duty of reasonable care.

118. Defendant City of Tempe and TPD breached that duty, and were ordinarily and grossly negligent, when they failed, as more fully described herein, to implement adequate policies and procedures concerning TPD officer encounters with persons of interest, use of force and to provide proper and timely medical care for those who have been shot by TPD officers; to implement mandatory training in regards to officer encounters with persons of interest, use of force and proper and timely medical treatment; and, more specifically, when it either failed to train or to inadequately trained Defendant Ouimette regarding such encounters, including but not limited to the appropriate use of force, deadly or otherwise, proper procedures for detention and interactions with persons of interest, use of force and policies and procedures regarding providing individuals who have just been shot with proper and timely medical treatment.

119. As a direct and proximate result of Defendants' conduct, Plaintiff sustained injuries including the loss of love, affection and companionship of her son, Dalvin.

120. Plaintiff also suffered from severe personal anguish, suffering and shock, especially at the thought of her teenaged son having been left alone in a shed for at least one hour and six minutes to die a terrifying, slow and painful death.

## COUNT IV – Arizona Law claim for Intentional Infliction of Emotional Distress – By Plaintiff, individually, against Defendant Ouimette and City of Tempe

121. Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

122. At all relevant times, Defendant Ouimette was acting within the course and scope of employment with the Defendant City of Tempe and the City of Tempe is therefore vicariously liable for the acts and omissions of Defendant Ouimette.

123. Defendant Ouimette made the conscious decision to pull out his weapon and shoot Dalvin Hollins, who was not wearing a shirt and was not carrying a weapon, in the back.

124. Defendant Ouimette, through his conduct, either intended to inflict emotional distress or knew that severe emotional distress would result as to Dalvin's relatives when he murdered a 19-year-old, unarmed teenager.

125. Defendant Ouimette's conduct was extreme and outrageous as Defendant Ouimette had absolutely no reason to murder Dalvin, since Dalvin did not point a black semi-automatic hand gun at Defendant Ouimette and no witnesses indicated that they saw anything that could be perceived as a gun. Additionally, Defendant Ouimette could have used non-deadly force, especially considering Dalvin did not

1   have a black semi-automatic handgun, Dalvin did not point a black semi-automatic

2   handgun at Defendant Ouimette, Dalvin did not tell Defendant Ouimette that

3   Dalvin would shoot or otherwise threaten Defendant Ouimette, and Dalvin did not

4   assault or threaten Defendant Ouimette. Further, Defendant Ouimette did not have

5
6   any concrete information that Dalvin was the person who committed the alleged

7   Walgreens robbery.

8   126. Defendant Ouimette's failure to render medical aid to a person that Defendant

9   Ouimette had just shot in the back also shocks the conscience, especially

10
11  considering Defendant Ouimette no longer considered Dalvin a threat.

12  127. As a direct and proximate result of Defendants' acts and omissions, Plaintiff Sarah

13  has been severely damaged as more fully set forth herein.

14  **COUNT V – Federal Civil Rights Claims Under 42 U.S.C. § 1983 (Excessive Force)**
15  **– *By Plaintiff as Personal Representative against Defendant Ouimette***

16  128. Plaintiff hereby incorporates by reference the preceding paragraphs as though fully

17  set forth herein.

18
19  129. The acts and conduct of Defendant Ouimette constituted an illegal and

20  unconstitutional use of deadly force under the Fourth and Fourteenth

21  Amendments.

22  130. As a direct and proximate result of the excessive and unreasonable force used

23
24  upon Dalvin and the acts and omissions of Defendant Ouimette as outlined above,

25  Dalvin died and Plaintiff sustained the damages more fully described herein.

26

**COUNT VI -** *Monell* **Federal Civil Rights Claims Under 42 U.S.C. § 1983 (Excessive Force: Unconstitutional Policy and Custom; Failure to Supervise & Discipline; Failure to Train; Negligent Hiring) –** *By Plaintiff as Personal Representative against* *Defendant City of Tempe*

131. Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

132. Prior to the July 27, 2016 shooting of Dalvin, TPD routinely interacted with citizens of Tempe.

133. Prior to the July 27, 2016 shooting of Dalvin, TPD knew that if it did not have adequate policies and procedures applicable to all TPD officers handling encounters with citizens "under stress" how to use a BWC "under stress" and the appropriate use of force, that such would result in the deprivation of United States citizens' constitutional rights, specifically the right to be free from excessive force at the hands of law enforcement officers and officers ability to cover up their atrocious behavior.

134. TPD has implemented policies and procedures in regards to BWCs, yet has failed to properly train its officers in regards to the BWCs, and/or failed to supervise its employees in regards to BWC's.

135. According to Defendant Ouimette, TPD has not implemented training in regards to the BWC's involving "how to use a camera under stress." TPD knew or should have known that at times its officers could be placed under stress.

136. TPD has either failed to implement policies and procedures, failed to train or failed to supervise its employees regarding the use of force and recognition of what constitutes a semi-automatic handgun; to implement mandatory training in regards to use of force and recognition of what constitutes a semi-automatic handgun; and, more specifically, it either failed to train or inadequately trained Defendant Ouimette regarding encounters with persons of interest, including but not limited to the appropriate use of force, deadly or otherwise, proper procedures for detention and interactions with persons of interest and use of force and recognition of what constitutes a semi-automatic handgun.

137. Notwithstanding this knowledge, TPD final policymakers, including its Chief of Police, and therefore also Defendant City of Tempe, made deliberate and conscious decisions to create inadequate policies and procedures, if any at all.

138. Notwithstanding this knowledge, TPD final policymakers, including its Chief of Police, and therefore also Defendant City of Tempe, deliberately and consciously adopted unconstitutional policies and/or encouraged, tolerated, or ratified unconstitutional widespread TPD practices and customs.

139. The policies or customs/practices of Defendant City of Tempe directly and proximately caused the violation of Dalvin's constitutional rights, his death and other damages as more fully set forth herein.

140. The Defendant City of Tempe directly and proximately caused the violation of Dalvin's constitutional rights, his death and other damages as more fully set forth

herein, with its encouragement, toleration, ratification, and deliberate indifference to the policies, or patterns, practices, and customs, as well as its deliberate indifference to the need for more or different employment screening, training, supervision, investigation, or discipline in the area of use of force and BWC's.

**COUNT VII – *Monell* Federal Civil Rights Claims Under 42 U.S.C. § 1983 (Deliberate Indifference to Serious Medical Needs: Unconstitutional Policy and Custom; Failure to Supervise & Discipline; Failure to Train; Negligent Hiring) – *By Plaintiff as Personal Representative against Defendant City of Tempe***

141. Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

142. Defendant Ouimette shot Dalvin in the back and both Defendants Ouimette and TPD knew that Dalvin was shot in the back.

143. Upon information and belief, people heard Dalvin screaming for help and nurses requested that they be allowed inside the shed to help. TPD, however, refused to allow them inside.

144. Any reasonable person either knew or should have known that a bullet to a person's back requires immediate medical attention and failure to provide immediate medical attention could result in significant injury, pain and/or death.

145. TPD knew that Dalvin was shot and should have provided Dalvin with the requisite medical treatment, especially considering Defendant Ouimette no longer considered Dalvin a threat. At minimum, TPD could have sent a police canine, a negotiator to determine whether Dalvin would come out voluntarily, initiate tear

gas, or some other means into the shed to check on Dalvin. Despite the many options, TPD failed to check on Dalvin's wellbeing.

146. TPD knew that a person who is shot would need medical attention. Witnesses stated that the shed had only one entrance point and that Dalvin was screaming in pain.

147. Despite over an hour passing between the shooting and TPD entering the shed, no medical care was provided.

148. The actions of TPD were callous and deliberately indifferent to the medical needs of Dalvin.

149. The policies and procedures as well as the training by TPD, either failed to address a known situation or failed to properly address the medical needs of a person shot by a member of the police department.

150. Prompt medical attention would have very likely have prevented the death of Dalvin given the information contained in the medical examiner's report.

151. According to the medical examiner, Alisha D. Bogus, Dalvin's lung collapsed but it was not immediately fatal.

152. Defendant Ouimette's shooting of Dalvin and Defendants TPD's failure to provide Dalvin with the necessary medical care caused Dalvin's death.

153. TPD has either failed to implement policies and procedures, failed to train or failed to supervise its employees regarding providing proper and timely medical treatment to those who have been shot, to implement mandatory training in

regards to medical treatment; and, more specifically, it either failed to train or inadequately trained Defendant Ouimette and other unknown officers regarding providing people with the requisite medical treatment.

154. Notwithstanding this knowledge, TPD final policymakers, including its Chief of Police, and therefore also Defendant City of Tempe, made deliberate and conscious decisions to create inadequate policies and procedures, if any at all.

155. Notwithstanding this knowledge, TPD final policymakers, including its Chief of Police, and therefore also Defendant City of Tempe, deliberately and consciously adopted unconstitutional policies and/or encouraged, tolerated, or ratified unconstitutional widespread TPD practices and customs. The policies or customs/practices of Defendant City of Tempe directly and proximately caused the violation of Dalvin's constitutional rights, his death and other damages as more fully set forth herein.

156. The Defendant City of Tempe directly and proximately caused the violation of Dalvin's constitutional rights, his death and other damages as more fully set forth herein, with its encouragement, toleration, ratification, and deliberate indifference to the policies, or patterns, practices, and customs, as well as its deliberate indifference to the need for more or different employment screening, training, supervision, investigation, or discipline in the area of providing proper medical treatment.

**COUNT VIII – Federal Civil Rights Claims Under 42 U.S.C. § 1983 (Deliberate Indifference to Serious Medical Needs) - *By Plaintiff as Personal Representative against Defendant Ouimette and TPD Officers***

157. Plaintiff hereby incorporates by reference the preceding paragraphs as fully set forth herein.

158. Upon Defendant Ouimette's own admission, after Defendant Ouimette shot Dalvin, Dalvin was no longer a threat. Defendants Ouimette and John/Jane Does should have provided Dalvin with medical care immediately.

159. Defendant Ouimette and Defendant(s) John/Jane Doe(s) TPD knew that Dalvin had been shot and either intentionally or with deliberate indifference to Dalvin's health, failed to provide Dalvin with any medical treatment for at least one hour and six minutes.

160. Dalvin suffered severe emotional and physical pain as he laid in the storage shed until he bled out and died. Defendants Ouimette and John/Jane Does knew that a person who is shot would need medical attention. Witnesses stated that the shed had only one entrance point and upon information and belief, that Dalvin was screaming in pain.

161. Despite over an hour passing between when the shooting occurred and TPD entering the shed, no medical care was provided.

162. The actions of Defendants Ouimette and John/Jane Does were callous and deliberately indifferent to the medical needs of Dalvin.

163. Prompt medical attention would have likely have prevented the death of Dalvin given the information contained in the medical examiner's report.

**COUNT IX– Arizona Law Claims for Negligence (ordinary & gross) - *By Plaintiff as Personal Representative against Defendant Ouimette and City of Tempe***

164. Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

165. It was the duty of Defendant Ouimette to exercise reasonable care in his interactions with Dalvin Hollins.

166. Defendant Ouimette breached that duty, and was ordinarily and grossly negligent when with a conscious indifference towards Dalvin's life, shot Dalvin and failed to subsequently provide him with medical treatment.

167. As a direct and proximate result of Officer Ouimette's actions, Dalvin died a slow and painful death alone and afraid in a maintenance shed.

168. As a TPD employee, Defendant Ouimette had a duty to follow the policies and procedures, including but not limited to its BWC policies and procedures, which states that "[o]fficers shall use the BWC to record enforcement related contacts. The BWC should be activated prior to actual contact with the subject, or as soon as safely possible thereafter …"

169. Officer Ouimette failed to turn on his BWC, despite the fact that he had more than adequate time to turn on the BWC prior to his encounter with Dalvin, which allowed him to attempt to cover up his atrocious actions and/or inactions.

170. As a direct and proximate result of Officer Ouimette's failure to turn on his BWC, the incident was not recorded and crucial substantive evidence was lost, which caused damages.

171. At all relevant times, Defendant Ouimette was acting within the course and scope of employment with the Defendant City of Tempe and the City of Tempe is therefore vicariously liable for the acts and omissions of Defendant Ouimette.

172. Defendant City of Tempe and TPD owed Dalvin a duty of reasonable care.

173. Defendant City of Tempe and TPD breached that duty, and were ordinarily and grossly negligent, when they failed, as more fully outlined above, to implement adequate policies and procedures concerning TPD officer encounters with citizens "under stress," how to use a BWC "under stress," and, to provide proper and timely medical treatment; to implement mandatory training in regards to use of force, use of BWC's and medical treatment; and, more specifically, when it either failed to train or inadequately trained Defendant Ouimette and other officers regarding such encounters, including but not limited to the appropriate use of force, deadly or otherwise, proper procedures for detention and interactions with persons of interest and use of force proper procedures in regards to BWCs and medical treatment

174. As a direct and proximate result of Defendants' conduct, Plaintiff sustained injuries including great physical injuries, pain and mental anguish which resulted

in his death, as well as the loss of earning power and earning potential and deprivation of the normal activities and pursuits and pleasures of life.

### COUNT X – Arizona Law Claims for Assault and Battery - *By Plaintiff as Personal Representative against Defendant Ouimette and City of Tempe*

175. Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

176. Defendant Ouimette wrongfully and unconstitutionally killed Dalvin when Defendant Ouimette, upon information and belief, chased Dalvin from approximately twenty-two to seventy-five feet behind Dalvin, and chose to raise and discharge his firearm, which struck Dalvin the back.

177. At all relevant times, Defendant Ouimette was acting within the course and scope of employment with the Defendant City of Tempe and the City of Tempe is therefore vicariously liable for the acts and omissions of Defendant Ouimette.

## DAMAGES

178. Plaintiff hereby incorporates by reference the preceding paragraphs as though fully set forth herein.

179. As a direct and proximate result of Defendants' acts and omissions, Sarah has incurred damages in the form of funeral and burial expenses for her son, Dalvin, and the loss of Dalvin's income, services, love, affection, care, companionship, support and guidance.

180. As a direct and proximate result of Defendants' acts and omissions, Sarah has suffered and will continue to suffer anguish, sorrow, stress, mental suffering, pain and shock, especially considering the manner in which Dalvin died, as a result of the death of her son, Dalvin.

181. As a direct and proximate result of the conduct of Defendant, Dalvin suffered physical injuries, pain, emotional distress and death, all caused by the violation of his rights under the United States Constitution and federal law.

182. As a direct and proximate result of Defendants' actions and inactions, Plaintiff's decedent, Dalvin, prior to his death, suffered from a gunshot wound by reason of which he suffered great physical injuries, pain and mental anguish which resulted in his death, as well as the loss of earning power and earning potential and deprivation of the normal activities and pursuits and pleasures of life.

183. The actions of the Defendants shock the conscience and were guided by an evil mind. Defendants intended to injure Plaintiffs and/or although not intending to cause injury, consciously pursued a course of conduct knowing that it created a substantial risk of significant harm to others.

184. For the reasons stated above, punitive damages are warranted, which are permitted under federal law.

185. Pursuant to 42 U.S.C. 1988, Plaintiffs are entitled to attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sarah Coleman individually and on behalf of the Estate of Dalvin Hollins respectfully requests:

A. A trial by jury on each of Plaintiff's claims that are triable by a jury;

B. Compensatory damages, loss of income, impairment of earning capacity, medical and physical expenses, loss of consortium;

C. Recovery of damages arising from the violations of Dalvin's constitutional rights, including but not limited to survival damages and Dalvin's pre-death pain and suffering;

D. Punitive damages against Defendant Ouimette under federal law and to the extent allowed under state law;

E. Reasonable attorneys' fees and costs to the extent allowed under state and federal law; and,

F. All other relief deemed just and proper

DATED this __19th__ day of July, 2017

DOW LAW OFFICE

David W. Dow
*Attorney for Plaintiffs*