**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Sarah Coleman,<br><br>        Plaintiff,<br><br>v.<br><br>City of Tempe, et al.,<br><br>        Defendants. | No. CV-17-02570-PHX-DLR<br><br>Consolidated with:<br>Case No. CV-17-02571-PHX-DLR<br><br>**ORDER** |

Plaintiffs Sarah Coleman and Calvin Hollins allege that Defendant Edward Ouimette, a police lieutenant with Defendant the City of Tempe, unlawfully used deadly force when he shot and killed their son, Dalvin Hollins.[1] Before the Court is Defendants' motion for summary judgment (Doc. 78), which is fully briefed. For the following reasons, Defendants' motion is granted in part and denied in part.

**I. Background**

On July 27, 2016, Dalvin Hollins, a 19-year-old black male, was shot and killed. Earlier that morning, at approximately 9:05 a.m., Hollins robbed a pharmacy. Wearing a mask and carrying a black bag, Hollins jumped the pharmacy counter and demanded pharmacy employees turn over liquid codeine. Hollins told employees he had a gun and threatened to kill. After filling his bag with the drugs, Hollins jumped back over the counter and fled on foot. The pharmacy employees reported the robbery to police, providing a

---
[1] Plaintiffs move as individuals and on behalf of the estate of Dalvin Hollins.

description of Hollins and recounting Hollins' threat of having a gun and a willingness to kill.

Nineteen minutes after the robbery, Tempe Police Officer Terry Spencer observed Hollins, who no longer was wearing his shirt or mask, walking through a shopping center parking lot in the area. Spencer parked his patrol car, exited his vehicle, radioed for confirmation of the suspect's description, and approached Hollins. Before receiving clarification as to the suspect's description, Spencer asked Hollins if he could speak with him. Hollins demurred. When Spencer asked again, Hollins took off running northbound.

Pulling into the parking lot as Spencer approached Hollins, Ouimette observed Hollins begin running northbound and attempted to block his path with his patrol car. Hollins evaded Ouimette's car by pushing off the car's front fender. Hollins continued flight northbound. Ouimette followed in his patrol car. As Hollins neared Westchester Senior Care Center's campus, however, Ouimette exited his vehicle and continued the pursuit on foot. Walter Ramos, a Westchester employee, decided to follow behind the pursuit after seeing Hollins and Ouimette run past his office.

The parties offer vastly different versions of what happens next. According to Defendants, Hollins unsuccessfully tried to enter Westchester's Care Center. Turning westerly, Hollins next ran down the sidewalk bordering Westchester's parking lot. Still in pursuit, Ouimette ran through the center of the parking lot, parallel to Hollins. When the sidewalk ended, Hollins was forced to change directions southbound, and cut in front of Ouimette. At this point, Ouimette gave Hollins an oral command: "Police. Stop or I will shoot you." Hollins stopped and turned to face Ouimette with an outstretched arm and a black object in his hand. Perceiving the black object to be a gun, Ouimette feared that Hollins was going to kill him. Ouimette aimed at Hollins' chest. The moment he fired, Hollins turned away from Ouimette and began to run. The single shot struck Hollins in the back. As Ouimette fired, he moved for cover and fell on the parking lot pavement, breaking his wrist. By the time Ouimette returned to his feet, Hollins was gone.

According to Plaintiffs, however, Hollins did not have a gun or anything that could

be confused for one. Nor did he attempt to enter Westchester's Care Center. Instead, when Hollins reached Westchester's parking lot he turned left in a westerly direction and ran down the middle of the parking lot. Ouimette then shot Hollins in the back either (1) without issuing an oral command, (2) issuing a deficient command, or (3) after Hollins heeded the alleged command. Despite suffering a gunshot wound to his back, Hollins continued fleeing and entered Westchester's maintenance building when Luis Flores, a Westchester employee, exited.

From there, the remaining events are more or less undisputed. Ouimette got back on his feet and transmitted "shots fired" from his radio. Ouimette neither radioed nor told officers on scene that Hollins had a gun and pointed it at him. Next, Ouimette began evacuating the Care Center. Marlon Cruz, a Westchester employee who saw Hollins enter the maintenance building, informed Tempe Police that Hollins was bleeding from a wound in his chest and that there were no interior doors between the maintenance building and the Care Center. Cruz also told Tempe Police that Hollins could access the Care Center if he climbed through the maintenance building's drywall ceiling and onto the roof.

At approximately 9:29 a.m., Officers Adam and Michael Miller attempted to open the maintenance room's door, but it was locked. Officers then had Cruz unlock the door with his key, and an officer commanded Hollins to come out with his hands up. Officers received no response from Hollins, nor did they observe any movement from him. Officers then issued commands using a megaphone, instructing Hollins to come out with his hands up, or to yell if he was injured and unable to exit. Again, officers neither received a response from Hollins nor observed any movement. At 10:20 a.m., Tempe Police deployed a small robot into the maintenance building to locate Hollins. The robot found Hollins unresponsive on the floor. Paramedics entered the room at 10:25 a.m. and pronounced Hollins dead just three minutes later.

**II. Legal Standard**

Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates "that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the case, and a dispute is genuine if a reasonable jury could find for the nonmoving party based on the competing evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). Summary judgment may also be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The burden then shifts to the non-movant to establish the existence of a genuine and material factual dispute. *Id.* at 324. Thus, the nonmoving party must show that the genuine factual issues "'can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.'" *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (quoting *Anderson*, 477 U.S. at 250).

**III. Discussion**

In Counts I and V, Plaintiffs allege that Ouimette is liable under 42 U.S.C. § 1983 for using excessive force and depriving Plaintiffs of familial relationships in violation of their Fourth and Fourteenth Amendment rights. In Counts II and VIII, Plaintiffs allege that Ouimette[2] is liable under § 1983 for acting with deliberate indifference to Hollins' serious medical needs in violation of Hollins' Fourteenth Amendment rights. As to Counts VI and VII, Plaintiffs allege that the City of Tempe is liable under § 1983 for failing to adequately train Ouimette with respect to firearm recognition, body-worn camera usage, and providing prompt medical attention. Finally, in Counts III, IV, IX, and X, Plaintiffs allege state law claims for intentional infliction of emotional distress ("IIED"), assault and battery,

---

[2] The complaint also includes other unknown Tempe Police Department officers. Discovery is closed, however, and Plaintiffs have not identified these unknown officers. Accordingly, any claims against unknown parties not now identified are dismissed.

negligence, and wrongful death under A.R.S. § 12-612. Defendants move for summary judgment on all counts.

**A. Excessive Force in Violation of § 1983 (Counts I, V)**

Defendants argue that Ouimette is entitled to qualified immunity against Plaintiffs' excessive force claim.[3] In determining whether an officer is entitled to qualified immunity, the Court must consider (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014).

**1. Violation of Constitutional Right**

In Fourth Amendment excessive force cases, courts examine whether police officers' actions are objectively reasonable given the totality of the circumstances. *Graham v. Connor*, 490 U.S. 386, 397 (1989); *Byrd v. Phx. Police Dep't*, 885 F.3d 639, 642 (9th Cir. 2018). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396. And "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

Whether force is objectively reasonable depends on several factors ("*Graham* factors"), including: (1) the severity of the crime that prompted the use of force; (2) the threat posed by a suspect to the police or others; and (3) whether the suspect was resisting arrest. *Id.* The *Graham* factors, however, are not exclusive and courts must "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (internal quotation marks and citation omitted). Another relevant factor important here is whether proper warnings were given before employing force. *See, e.g.*,

---

[3] Although Defendants do not specifically challenge Plaintiffs' Fourteenth Amendment claims, both parties seem to agree that "Plaintiffs' Fourth and Fourteenth Amendment claims . . . boil down to a single question"—whether Ouimette was justified in using deadly force. (Doc. 93 at 2.)

*Hughes v. Kisela*, 841 F.3d 1081, 1085 (9th Cir. 2016).

"Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that summary judgment . . . in excessive force cases should be granted sparingly." *Glenn v. Wash. Cty.*, 673 F.3d 864 (9th Cir. 2011). This principle applies with particular force here, where the only witness to the shooting other than the officer was killed during the encounter. *See, e.g.*, *Gonzalez v. City of Anaheim*, 747 F.3d 789, 795 (9th Cir. 2014); *Lopez v. Gelhaus*, 871 F.3d 998, 1006 (9th Cir. 2017). "In such cases, [courts] must ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify." *Gonzalez*, 747 F.3d at 795 (internal quotation marks omitted). As such, courts are tasked with examining all the evidence in the record, including contemporaneous statements by the officer and available physical evidence, "to determine whether the officer's story is internally consistent with other known facts." *Id.* Courts also must "examine circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Id.*; *see also Lopez*, 871 at 1006. Where an officer's particular use of force is based on a mistake of fact, the Court asks whether a reasonable officer would have or should have accurately perceived that fact. *See, e.g.*, *Jensen v. City of Oxnard*, 145 F.3d 1078, 1086 (9th Cir. 1998).

Plaintiffs do not dispute that the crime at issue was severe and that Hollins was attempting to flee.[4] Therefore, the Court turns to the most important factor—the immediacy of the threat posed by the suspect to the police or others. *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc); *Gonzalez*, 747 F.3d at 797 (denying summary

---

[4] Although Plaintiffs do not challenge the severity of the crime at issue, it is worth noting that the Ninth Circuit "has applied this factor in two slightly different ways." *Nehad*, 929 F.3d at 1136. One way is using it "as a proxy for the danger a suspect poses at the time the force is applied." *Id.* Under this method, Hollins has a colorable argument that he was not engaged in a serious crime. *See, e.g.*, *Smith v. City of Hemet*, 394 F.3d 689, 702-703 (9th Cir. 2005) (en banc) (holding that, where suspect had physically assaulted his wife but was standing alone on his porch when officers arrived, "the nature of the crime at issue provid[ed] little, if any, basis" for the use of force); *Nehad*, 929 F.3d at 1136 ("Even if Nehad had made felonious threats or committed a serious crime prior to [the officer's] arrival, he was indisputably not engaged in any such conduct when [the officer] arrived, let alone when [the officer] fired his weapon.").

- 6 -

judgment where only question of fact existed as to immediacy of threat factor).

### a. Threat Posed by Hollins

"[A] simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). "The use of deadly force is only reasonable if a suspect poses a *significant* threat of death or serious physical injury to the officer or others." *S.R. Nehad v. Browder*, 929 F.3d 1125, 1132-33 (9th Cir. 2019) (emphasis in original) (internal quotation marks and citation omitted).

Having reviewed the parties' briefs and the evidence cited therein, the Court finds that genuine factual disputes exist as to whether a reasonable officer in Ouimette's position would have perceived Hollins to pose a significant threat of death or serious bodily injury. For example, Ouimette contends that a reasonable officer in his position would have perceived Hollins to have a gun. In support, he relies on the following: (1) he heard radio reports from the robbery stating that the suspect had a gun and threatened to kill people; (2) Hollins matched the description of the suspect; (3) Oumitte ordered Hollins to stop; (4) Hollins had a black object that in his right hand when he turned to face Ouimette; (5) Ouimette feared Hollins was going to shoot him; and (6) Ouimette told paramedics after the shooting that Hollins did not fire back at him. (Doc. 79-2 at 42-43, 47, 49-53, 83.)

In contrast, several eye witnesses reported to the police and testified at deposition that they did not see Hollins with a gun. (*See, e.g.*, Docs. 94-7 at 11, 15-16 (Ramos "did not see a gun" and instead "saw a shirt or a bag on (sic) his hand"); 94-7 at 49 (Dawn Rice saw that Hollins "had his shirt in his hand" and that the shirt was "whipping around"); 94-9 at 6-7 (Sara Reynolds identified "a dark cloth in [Hollins'] right hand"); 94-9 at 2-3 (Allison Porter did not see Hollins carrying anything); Doc. 94-8 at 19-20 (Cruz saw Hollins right after he was shot and did not observe Hollins carrying a gun or anything that resembled one).) Moreover, the police radio transmission confirmed multiple times that a gun was not seen at the pharmacy, only threatened. (Doc. 94-2 at 89 (Dispatch responded "verified, no gun seen just threatened").)

Moreover, Ouimette testified at his deposition that he had the opportunity to observe Hollins' hands on multiple occasions before shooting him. Ouimette saw Hollins' hands when he attempted to cut off Hollins' path with his patrol car and Hollins pushed off of the front driver's side fender. Ouimette did not see a gun. (Doc. 94-3 at 30, 143.) Ouimette also testified to seeing Hollins pull on the door handle as he attempted to enter the Care Center. Again, Ouimette did not see a gun. (*Id.* at 33.) In fact, Ouimette testified that he did not see a gun until the moment Hollins turned to face him.[5] (*Id.* at 35.)

There also is post-shooting circumstantial evidence supporting Plaintiffs' position that Ouimette did not actually perceive Hollins to have a gun. For example, Ouimette neither reported on his radio nor to officers on scene that Hollins had a gun or that he pointed it at him. (Docs. 94-4 at 175-77; 94-5 at 67-68; 94-9 at 8-9.) If Ouimette feared that Hollins had a gun, it would have been reasonable for him to immediately report it to other officers and bystanders. In debriefing with his escorting officer, Ouimette provided a detailed description of Hollins but made no mention of him having a gun or pointing it at him. (Docs. 94-2 at 75; 94-9 at 12.) Ouimette did not tell Sergeant Bulson, the escorting officer, that he feared Hollins had a gun. Bulson first learned that Ouimette was alleging Hollins was armed when he overheard Ouimette tell the doctor at the hospital. (Doc. 94-9 at 13.)

Next, there is a genuine dispute of fact as to whether Hollins attempted to access the Care Center. For instance, Ouimette testified that he observed Hollins attempt to enter the Care Center but give up when he discovered the doors were locked.[6] (Doc. 79-2 at 47.) In

---

[5] Defendants argue that Ouimette need not have observed a gun in Hollins' hand before Hollins turned because he "could have concealed a gun" in either his bag or his sweatpants. (Doc. 109 at 7.) This argument, however, is unsupported by Ouimette's own deposition testimony, where he stated that he did not observe Hollins reach into his backpack or his pocket to pull out a gun. (Doc. 94-3 at 57.)

[6] Defendants also rely on a number of facts that Ouimette did not know of at the time of the shooting. For instance, as evidence that Hollins was attempting to enter the Care Center, Defendants note "Ramos testified that Hollins opened the Care Center's laundry room and briefly looked inside." (Doc. 109 at 7-8.) Ouimette did not observe Hollins attempt to enter the laundry room and had no knowledge of as much. As previously mentioned, the Court is "limited to considering what facts the officer could have known at the time of the incident." *Davis v. United States*, 854 F.3d 594, 598 (9th Cir. 2017). The Court therefore does not consider in its qualified immunity analysis facts Ouimette did not

contrast, Ramos, who followed behind Ouimette as he pursued Hollins, testified that he does not remember Hollins running up to the Care Center doors. Instead, he recalled that when Hollins reached the Westchester parking lot, he turned and began running in a westerly direction.[7] (Doc. 94-7 at 14.)

Finally, there is a genuine dispute as to whether Hollins turned to face Ouimette. For his part, Ouimette contends that he aimed at Hollins' chest after Hollins turned to face him. Yet, despite aiming at his chest, it is undisputed that the bullet struck Hollins in the back. (Docs. 94-3 at 63; 94-5 at 80.) Ouimette argues that his recollection of events is not inconsistent with a bullet wound in Hollins' back because the evidence "shows that Hollins turned away from Ouimette to continue running as Ouimette fired his weapon." (Doc. 79 at 14.) In support, Ouimette highlights that Detective Alan Akey testified that he thought a gunshot wound to the back was consistent with Ouimette's account of events. (Doc. 79-9 at 37.) Whether Hollins, facing Ouimette when the shot was fired, could turn fast enough to be hit in the back is a question of fact. Even Detective Akey seems to recognize that this is a question of fact for the jury to resolve, stating that he "wouldn't want to give a concrete answer" because "[t]here's so many factors going into that[.]" (*Id.*)

Based on the competing evidence, the Court finds that whether Hollins posed a significant threat of death or serious physical injury to Ouimette or Westchester's residents is genuinely disputed.

**b. Warning**

---

know at the time of the shooting.

[7] Even if a reasonable officer would have thought that Hollins was armed and that he had attempted to enter the Care Center, a jury still could find it unreasonable to employ lethal force against Hollins. After all, Hollins was unable to access the Care Center and was running away from the Center's entrance at the time he was shot. A reasonable jury could find that, to the extent Hollins posed a significant threat of death or serious bodily injury to Westchester residents, he no longer presented such a threat when he resumed flight. *See, e.g.*, *Harris v. Roderick*, 126 F.3d 1189, 1203 (9th Cir. 1997) (noting that the commission of a violent crime in the immediate past is not, without more, justification for use of deadly force); *Glenn*, 673 F.3d at 876-77 ("We have made clear that the desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury.")

"Appropriate warnings comport with actual police practice" and "such warnings should be given, when feasible, if the use of force may result in serious injury." *Glenn*, 673 F.3d at 876; *see also Deorle*, 272 F.3d at 1284 ("warnings should be given, when feasible, if the use of force may result in serious injury, and that the giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test."); *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997) (noting that "whenever practicable, a warning must be given before deadly force is employed"); *Gonzalez*, 747 F.3d 784 (9th Cir. 2014) (recognizing rule that "an officer must give a warning before using deadly force 'whenever practicable'").

Whether Ouimette provided an appropriate warning before shooting Hollins is a material fact that is genuinely disputed. On the one hand, Ouimette testified at his deposition that he issued an oral command, stating: "Police. Stop, or I will shoot you." (Doc. 79-2 at 49.) On the other hand, Plaintiffs offer testimony from two witnesses who did not hear such a command.[8] (*See* Docs. 94-7 at 16 (Ramos); 94-9 at 2-3 (Porter).) Plaintiffs also offer evidence that the command Ouimette claims he gave would have been deficient. For example, Ouimette testified that he instructed Hollins to stop and that Hollins did so. (Doc. 94-3 at 35.) Despite not instructing Hollins to "stop and don't turn" or "stop and put your hands up" or "stop and don't turn towards me at all," Ouimette shot Hollins because he turned to face the officer. (*Id.*)

On this record, a jury reasonably could question Ouimette's credibility and accuracy, and in turn find that Hollins' constitutional rights were violated. Therefore, the Court proceeds to the next step of the qualified immunity analysis.

### 2. Clearly Established Right

An officer is not entitled to qualified immunity if the law was "sufficiently clear that

---

[8] Defendants quibble with Plaintiffs' evidence, arguing, for example, that Ramos' testimony can be disregarded because he stated that he "was too busy in [his] own world." (Doc. 109 at 9 n.5.) This does not change that Ramos testified to hearing the gun shot, yet not a command. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," and when considering a summary judgment motion, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

a reasonable official would understand that what he [was] doing violate[d] [a constitutional] right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Reasonableness is not a demanding standard. *A.D. v. Cal. Highway Patrol*, 712 F.3d 446 (9th Cir. 2013). That is, there need not be a prior case "directly on point," so long as there is precedent "plac[ing] the statutory or constitutional question beyond debate." *Lopez*, 871 F.3d at 1017.

Viewing the evidence in the light most favorable to Plaintiffs, Ouimette chased Hollins onto Westchester's campus. Ouimette neither saw Hollins with a gun nor attempt to enter Westchester's Care Center. Instead, as Hollins fled in the opposite direction of the Care Center, Ouimette shot Hollins in the back, killing the teenager. Ouimette either did not warn before using deadly force, or issued a single, deficient warning.

Defendants "cannot credibly argue that the prohibition on the use of deadly force under these circumstances was not clearly established" at the time of the shooting. *Nehad*, 929 F.3d at 1141; *see also Torres v. City of Madera*, 648 F.3d 1119, 1128 (9th Cir. 2011); ("[F]ew things in our case law are as clearly established as the principle that an officer may not seize an unarmed, nondangerous suspect by shooting him dead in the absence of probably cause to believe that the [] suspect poses a threat of serious physical harm."); *N.E.M. v. City of Salinas*, 761 F. App'x 698, 700 (9th Cir. 2019) ("At the time of the shooting, it was clearly established that officers may not use deadly force against a person who is armed but cannot reasonably be perceived to be taking any furtive, harrowing, or threatening actions. This is true even in circumstances in which the suspect has allegedly 'committed a violent crime in the immediate past.'"); *Harris*, 126 F.3d at 1204 (9th Cir. 1997) ("Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed."). Nor can Defendants claim that there was no clearly established right of a decedent's parents to recover for a loss of familial association when an officer unreasonably kills a fleeing suspect. *See, e.g.*, *Ramirez v. Cty. of San Diego*, No. 06-CV-1111-JM (JMA), 2009 WL 1010898, at *7 (S.D. Cal. April 15, 2009). Ouimette therefore is not entitled to qualified immunity and Defendants' motion for summary judgment on Plaintiffs' excessive force

claims is denied.

**B. Deliberate Indifference in Violation of § 1983 (Counts II and VIII)**

Plaintiffs also claim that Ouimette acted with deliberate indifference to Hollins' serious medical needs. "Police officers are required to provide medical care to persons who have been injured while being apprehended." *Rascon v. Brookins*, No. 14-CV-749-PHX-JJT, 2018 WL 783675, at *15 (D. Ariz. Feb. 8, 2018) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). When a plaintiff alleges deficient medical care both during and immediately following an arrest, courts in the Ninth Circuit analyze the claim under the Fourth Amendment's objective reasonableness standard. *See, e.g.*, *Tatum v. City and Cty. of S.F.*, 441 F.3d 1090, 1098-99 (9th Cir. 2006) (analyzing officer's decision not to perform CPR under Fourth Amendment); *see also Greer v. City of Hayward*, 229 F. Supp. 3d 1091, 1107 (N.D. Cal. 2017) ("Under the Fourth Amendment, officers must provide objectively reasonable post-arrest medical care to a detainee."). Thus, the appropriate inquiry is whether an officer's conduct is "'objectively reasonable in light of the facts and circumstances confronting them' without regard for an officer's subjective intentions." *Bryan*, 630 F.3d at 832 (quoting *Graham*, 490 U.S. at 397). In the Ninth Circuit, an officer acts reasonably under the Fourth Amendment when he "promptly summons the necessary medical assistance, even if the officer did not administer CPR." *Tatum*, 441 F.3d at 1099.

It is undisputed that neither Ouimette nor any other member of the Tempe Police department rendered medical aid to Hollins. (*See, e.g.*, Doc. 95-3 at 42.) It also is undisputed that Emergency Medical Technicians were not dispatched until 10:10 a.m., and did not enter the maintenance building until 10:25 a.m., approximately an hour after Hollins was shot in the back. (Doc. 94-11 at 30-31.) Instead, Defendants contend that delay in entering the maintenance building and rendering aid was reasonable because "officers had a duty to evacuate Westchester residents to ensure their safety." (Doc. 79 at 17.)

Again, the Court finds that there are sufficient facts from which a jury could find

Ouimette's conduct unreasonable. For example, Defendants repeat their refrain that "Hollins stated that he had a gun and would kill people" and highlight that Hollins "could access the [Care Center] through the maintenance building ceiling."[9] (Doc. 109 at 13.) Hollins, however, did not have a gun, and the Court has already found that there is a genuine dispute of fact as to whether Ouimette should have known as much. There also is evidence that police knew or should have know that Hollins suffered a gun shot wound. (Docs. 79-2 at 51; 94-8 at 26.) Finally, employees of the facility informed police that there was no entry to the Care Center from the maintenance building, or that any entry required breaking through the maintenance building's drywall ceiling. (Docs. 94-7 at 11; 109 at 13.) Finding a genuine dispute of fact, the Court denies Defendants' motion for summary judgment with respect to the deliberate indifference claim.

**C. Assault and Battery, Wrongful Death, and Negligence (Counts III, IX, X)**

Defendants argue, generally, that "[g]iven the totality of circumstances, Ouimette is entitled to qualified immunity because his use of deadly force was reasonable, and Plaintiffs' federal and state law claims of excessive force and violation of civil rights fail as a matter of law." (Doc. 78 at 14.) Although Defendants cite A.R.S. §§ 13-409 and -410 in support, they make no effort to meaningfully grapple with the statute. (*Id.*) Instead, Defendants cursorily argue that, because Ouimette is entitled to qualified immunity for his use of deadly force under the federal standard, he likewise is entitled to immunity under Arizona law. The Court, however, has found that there are material disputes of fact regarding the reasonableness of Ouimette's beliefs and conduct. Accordingly, to the extent Defendants seek summary judgment on theses state law claims for the same reasons they have moved on the federal claims, their motion is denied.[10]

---

[9] Tempe Police also waited 20 minutes after Hollins was shot to call for the Special Weapons and Tactics Team to enter the maintenance building. (Doc. 94-2 at 16.)

[10] Although the Court denies summary judgment based on the arguments raised in Defendants' briefs, the Court has doubts about whether a negligence claim is cognizable under these circumstances. Specifically, in an interview with Detective Akey, Ouimette stated "I know I intentionally fired my weapon at him." (Doc. 94-3 at 145.) Battery is an intentional tort. There is no such thing as a negligent assault or a negligent battery. *See, e.g.*, *Ryan v. Napier*, 425 P.3d 230, 233 (Ariz. 2018); *Lewis v. Dirt Sports LLC*, 259 F. Supp. 3d 1039, 1046 (D. Ariz. 2017). Defendants did not raise this issue in their summary

- 13 -

### D. IIED (Count IV)

To succeed on an IIED claim, a plaintiff must prove that a "defendant's acts are so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972, 1018 (D. Ariz. 2012) (citing *Patton v. First Fed. Sav. and Loan Ass'n of Phx.*, 578 P.2d 152, 155 (Ariz. 1978)). IIED requires that (1) the conduct by the defendant be "extreme" and "outrageous;" (2) the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and (3) severe emotional distress must indeed occur as a result of defendant's conduct. *Dougall v. City of Tucson*, No. 14-CV-2255-TUC-JGZ, 2017 WL 1210340, at *7 (D. Ariz. Mar. 31, 2017) (citing *Citizen Publ'g Co. v. Miller*, 115 P.3d 107, 110 (Ariz. 2005)). Defendants challenge only whether Ouimette's conduct was extreme and outrageous. (Doc. 78 at 15.)

The Court has found genuine disputes of fact regarding the reasonableness of Ouimette's beliefs and conduct. Taking the facts in the light most favorable to Plaintiffs, as the Court must, a reasonable jury could find that shooting an unarmed, fleeing suspect was extreme and outrageous conduct. Accordingly, the Court denies summary judgment on Plaintiffs' IIED claim.

### E. *Monell* Claims (Counts VI and VII)[11]

Municipalities cannot be vicariously liable for the deprivation of constitutional rights by employees. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978). A municipality may be liable under § 1983, however, if a plaintiff shows "that a policy or custom led to the plaintiff's injury," and "that the policy or custom . . . reflects deliberate indifference to the constitutional rights of its inhabitants." *Castro v. Cty. of L.A.*, 833 F.3d

---

judgment motion, however, and the Court declines to address it here without the benefit of adversarial briefing.

[11] Despite purporting to move for summary judgment on all Plaintiff's claims, Defendants do not challenge Plaintiffs' *Monell* claim against the City of Tempe with respect to training and policies or procedures on providing emergency medical aid to individuals shot by Tempe Police personnel. (Doc. 17 ¶¶ 139-53.)

1060, 1073 (9th Cir. 2016) (internal quotation marks and citation omitted); *see also Connick v. Thompson*, 563 U.S. 51, 60 (2011) ("Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury.").

A municipality may be held liable for the inadequacy of police training only if the plaintiff shows "(1) he was deprived of a constitutional right, (2) the [municipality] had a training policy that amounts to deliberate indifference to the constitutional rights of the persons' with whom its police officers are likely to come into contact; and (3) his constitutional injury would have been avoided had the [municipality] properly trained those officers." *Blankenhorn v. City of Orange*, 485 F.3d 463, 484 (9th Cir. 2007) (internal quotation marks and citations omitted.)

Defendants first argue that "no *Monell* claim can lie" as to Ouimette's training in firearm recognition and body-worn camera usage because "Ouimette's use of deadly force was reasonable under the totality of circumstances and did not violate Hollins' constitutional rights." (Doc. 78 at 16; *see also* Doc. 109 at 12.) The Court has determined that there are questions of fact as to whether Ouimette's use of force was reasonable. Alternatively, Defendants argue that, even if the Court were to assume that Ouimette was inadequately trained in these matters, the claim still must be dismissed because neither training failure caused or contributed to any constitutional violation. With respect to the body-worn camera, the Court agrees that the causation element has not been met. Plaintiffs have offered no evidence that Ouimette's failure to turn on his body-worn camera was the proximate cause of Hollins' death. The Court cannot agree, however, as to the firearm recognition training. Ouimette testified that he shot Hollins because he believed that he was pointing a gun at him. (Doc. 94-3 at 41.) If it is true that City did not properly train its officers in firearm recognition, such a failure reasonably could be causally linked to Ouimette mistakenly identifying Hollins as having a gun.

**IV. Conclusion**

For the foregoing reasons, the Court grants summary judgment for Defendants on

Count V with respect to the failure to adequately train Ouimette in body-worn camera usage. The remainder of Defendants' motion for summary judgment is denied.[12]

**IT IS ORDERED** that Defendants' motion for summary judgment (Doc. 78) is **GRANTED in part and DENIED in part** as explained herein.

**IT IS FURTHER ORDERED** that the parties shall appear telephonically on **September 30, 2019 at 11:00 a.m.** in Courtroom 606, 401 West Washington Street, Phoenix, AZ 85003 before Judge Douglas L. Rayes to discuss setting a trial date and other pre-trial deadlines.

Dated this 13th day of September, 2019.

_____
Douglas L. Rayes
United States District Judge

---

[12] Defendants move for summary judgment on what they call Plaintiffs' "Return to Work Claim," (Doc. 78 at 17). The Court has scoured Plaintiffs' amended complaint (Doc. 17) and the parties' joint proposed discovery plan (Doc. 20) but can find no such claim. Nonetheless, Defendants brief the claim as if it is and has always been part of this case. The absence of a formally pled claim presents a practical problem: the Court does not know what the elements of this claim are. Is this a claim for violation of constitutional rights under § 1983, or perhaps some form of a state law negligence claim? The Court does not know because no party briefs the elements of a so-called "Return to Work Claim." Instead, Defendants argue without explanation that this claim must fail because the Tempe Police Department would have violated the Americans with Disabilities Act and the Family Medical Leave Act by putting Ouitmette through additional testing to determine his field readiness. (Doc. 78 at 17; Doc. 109 at 14.) Defendants do not explain how or why this is so.

To the extent this "Return to Work" claim is part of this case, the Court finds only that it cannot be pursued as a *Monell* claim because Plaintiffs offer no evidence that the Tempe Police Department has a policy or custom of allowing officers to return to work prematurely without demonstrating physical readiness. Because the Court has largely denied Defendants' motion for summary judgment, this case will proceed to trial absent a settlement. This means the parties will need to consider matters such as jury instructions, which in turn will require them to thoughtfully consider the nature and elements of the claims at issue. An amorphous "Return to Work" claim, untethered from any recognized state or federal cause of action, will not suffice at trial.