# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

_____

| | | |
|---|---|---|
| Sarah Coleman, et al., | ) | |
| | ) | No.  CV-17-02570-PHX-DLR |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Phoenix, Arizona |
| | ) | March 7, 2022 |
| City of Tempe, et al., | ) | 1:33 p.m. |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**BEFORE:  THE HONORABLE DOUGLAS L. RAYES, JUDGE**

**REPORTER'S EXCERPTED TRANSCRIPT OF PROCEEDINGS**

**JURY TRIAL - DAY 6**
**(Testimony of Ken Wallentine)**

Official Court Reporter:
Jennifer A. Pancratz, RMR, CRR, FCRR, CRC
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc 42
Phoenix, Arizona 85003-2151
(602) 322-7198

Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

**A P P E A R A N C E S**

For the Plaintiffs:

    Darius O. Bursh, Esq.
    McCain & Bursh PLC
    7420 E. Pinnacle Peak Rd., Suite 124
    Scottsdale, AZ 85255

    Spenser W. Call, Esq.
    Bighorn Law LLC
    500 W. Ray Rd., Suite 10
    Chandler, AZ 85225

    David W. Dow, Esq.
    Jennifer L. Ghidotti, Esq.
    Law Offices of David W. Dow PC
    3104 E. Camelback Rd., Suite 281
    Phoenix, AZ 85016

For the Defendants:

    Nicholas D. Acedo, Esq.
    Daniel P. Struck, Esq.
    Rachel Love, Esq.
    Struck Love Bojanowski & Acedo PLC
    3100 W. Ray Rd., Suite 300
    Chandler, AZ 85226

    Michael R. Niederbaumer, Esq.
    Sarah R. Anchors, Esq.
    Tempe City Attorney's Office
    P.O. Box 5002
    Tempe, AZ 85280

1                            **I N D E X**

2

3

**WITNESSES FOR THE**          **DIRECT**    **CROSS**    **REDIRECT**    **RECROSS**

4  **DEFENDANTS:**

5

**Ken Wallentine**

6  By Mr. Struck              8                        76

   By Mr. Bursh                          36

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              **P R O C E E D I N G S**

2              (Prior proceedings held on the record not transcribed

3    herein.)

4              (Jury present.)

5              THE COURT:  Ms. Ghidotti.

6              Who's going to handle the next witness for the

7    defense?

8              MR. BURSH:  I will, Your Honor.

9              THE COURT:  For the defense.

10             MR. BURSH:  Oh, I'm sorry.

11             MR. ACEDO:  Mr. Struck.

12             THE COURT:  Okay.  Would you two come up, please.

13             (At sidebar, on the record.)

14             MR. STRUCK:  This is our first sidebar in two trials.

15   Two years.

16             THE COURT:  What is the issue you want to raise?

17             MR. BURSH:  I think the issue she was going to

18   raise --

19             THE COURT:  Speak in the microphone.

20             MR. BURSH:  I think the issue she was going to raise

21   is that given what's gone on here in the last couple days,

22   we're afraid that this witness is going to start running with

23   answers that's going to get into stuff that you told him he

24   can't talk about.  You said all he could say --

25             THE COURT:  I can't predict that.  What do you want me

1   to do?

2          MR. BURSH:  Well, let Struck know that we can't get

3   this guy saying that his Lewinski experiment is what happened

4   in this case.  That's what you limited them.  You said they

5   could only say he read a book that says that a person can spin

6   within 3/10 of a second.  That's it.

7          THE COURT:  If he tries to violate the order --

8          MR. BURSH:  We just did this two days ago, but it gets

9   faster.  Once he gets it out, then you're going to be asking me

10  whether I want a mistrial.

11         THE COURT:  Are you familiar with my order on this?

12         MR. STRUCK:  Yeah, I am familiar.

13         THE COURT:  I said that he can testify that it's

14  possible, but he's not going to speculate that that's happened

15  here.

16         MR. BURSH:  He never talked about -- he just needs to

17  be limited to his report.  He never talked about body-worn

18  cameras, never talked about judgmental training and what the

19  significance in this case is.  All he talked about was --

20         THE COURT:  Okay.

21         MR. BURSH:  I'm sorry, Judge.

22         THE COURT:  Do you have anything you want to add,

23  Mr. Struck?

24         MR. STRUCK:  Yeah, a couple things.  First, I think

25  his report is -- there's more to his report than just, "I read

1    a book."  But I understand your ruling.

2              THE COURT:  My ruling was that he could not utilize

3    his testing because his testing was not done pursuant to any

4    sort of scientific method.  All he can talk about is what he

5    read in a book --

6              MR. STRUCK:  Okay.

7              THE COURT:  -- as far as the perception-reaction time

8    issue.

9              MR. BURSH:  And the other thing is, he never discussed

10   the issue with the body-worn camera in this case.  He never

11   discussed that this guy missed his judgmental training in this

12   case.  He never went into an analysis about what judgmental

13   training is.

14             THE COURT:  You know, I can't -- I don't remember --

15             MR. BURSH:  I just want to remind the Court, because

16   we got screwed the other day.

17             THE COURT:  All I'm telling you is that if he starts

18   to ask a question that is --

19             MR. BURSH:  Okay.

20             THE COURT:  -- outside what we've already ruled on or

21   outside his report, then you can raise lack of disclosure

22   issue.

23             MR. BURSH:  Okay.

24             THE COURT:  I can't anticipate all the questions.

25             MR. BURSH:  Okay, yeah.  I'm not mad at you, Judge.

```
1    I'm just trying to get some -- just make sure they don't make a
2    mistake like they did the other day.
3              THE COURT:  No, I understand.  All I'm saying is,
4    Mr. Struck, no nondisclosures.  I don't want to have a
5    nondisclosure issue.
6              MR. BURSH:  And let met say this, Judge.  I think he's
7    looking at last trial's testimony to say he can get in all of
8    this stuff.  We didn't -- I mean, we didn't object to it last
9    time.
10             THE COURT:  All right.
11             MR. BURSH:  Doesn't mean we're not objecting this
12   time.
13             THE COURT:  No, I understand.
14             MR. BURSH:  I don't want him doing that this time.
15             THE COURT:  We're going by the report, not by his last
16   testimony.
17             MR. BURSH:  Thank you.  That's what I want.
18             THE COURT:  Is this a deposition?
19             MR. BURSH:  No, that's his last testimony.
20             MR. STRUCK:  This is trial testimony that's four pages
21   of judgmental training.
22             MR. BURSH:  That's not in that report.  Should have
23   never got into that.
24             MR. STRUCK:  Excuse me.  One more thing, Your Honor.
25   I'm sorry.
```

1              I just want to make sure that the last time he asked

2    him about the Arce case, which is another City of Tempe

3    shooting involving somebody who was shot in the back.  He knows

4    he wasn't involved in that, but he specifically --

5              MR. BURSH:  I don't even know what the Arce case is.

6    I don't know.  You won't have to worry about it this time

7    because I forgot already.  I don't even know what it is.

8              THE COURT:  Okay.

9              (End of discussion at sidebar.)

10             THE COURT:  All right.  You can call your next

11   witness.  Where is the witness?

12             MR. STRUCK:  Your Honor, defendants call Ken

13   Wallentine.

14             THE COURT:  Mr. Wallentine, would you come up here,

15   please, and be sworn.

16                          KEN WALLENTINE,

17   called as a witness herein by the Defendants, having been first

18   duly sworn or affirmed, was examined and testified as follows:

19             THE COURT:  Mr. Struck, you may proceed.

20             MR. STRUCK:  Thank you, Your Honor.

21                        DIRECT EXAMINATION

22   BY MR. STRUCK:

23   Q.  Go ahead and make sure that mic is pulled up close enough

24   to you.  You can -- well, the judge can tell you about the mask

25   rule.  It's his rule.  I think the Court is allowing you to

1    take the mask off for the first 15 minutes.

2            THE COURT:  First 15 minutes, then put it back on.

3    Just so the jury gets to see your face for a while.  Unless

4    you're uncomfortable taking it off.

5            THE WITNESS:  No.  Thank you.  I'm fine, Judge.

6            THE COURT:  All right.

7            THE WITNESS:  Thank you.

8    BY MR. STRUCK:

9    Q.  Good afternoon, Mr. Wallentine.

10   A.  Hello.

11   Q.  What do you do for a living?

12   A.  I'm the chief of police in West Jordan, Utah.

13   Q.  And how long have you been chief of police?

14   A.  About -- well, at that agency, about three and a half

15   years.

16   Q.  And what do you do -- as chief of police, over whom do you

17   supervise?

18   A.  Well, with the assistance of two very able deputy chiefs, I

19   oversee all operations of the police department from patrol

20   services, investigative services.  We also provide forensic

21   services, animal services, community policing.  It is a

22   full-service police department.

23   Q.  Can you tell us a little bit about your education.

24   A.  Yes.  I have a law degree.  I graduated from J. Reuben

25   Clark Law School in 1990.  Prior to that, I have attended and

1    obtained an undergraduate degree in public administration from

2    Brigham Young University -- I don't remember the year, but it

3    was long before 1990 -- with an emphasis in justice

4    administration or police administration.

5              I've also attended and graduated from the Utah State

6    Police Academy in the very early 1980s.  Since then I've

7    attended a number of countless hundreds of hours of inservice

8    courses or postgraduate work.

9    Q.  Can you tell us about your law enforcement experience?

10   A.  Sure.  As I mentioned, I'm chief of police, have been a

11   chief of police at West Jordan City, which is Utah's third

12   largest city -- it's one of the metropolitan cities in the Salt

13   Lake Valley -- now for three and a half years.

14             Immediately prior to that, I worked for the Utah

15   Attorney General as director of a law enforcement training

16   center that was a new enterprise, one that won a person -- I

17   knew the fellow who became Attorney General, and he approached

18   me and we agreed to work on building a virtual reality and law

19   enforcement training center.  So I headed that up for a couple

20   of years.

21             Prior to that, I'd spent about a year and three or

22   four months, just less than a year and a half, doing private

23   consulting work with agencies across the United States.  I

24   worked for the United States Department of Justice.  I also

25   served as a special master appointed by a federal judge in

1    Atlanta, Georgia, to help oversee certain police reforms of the

2    Atlanta Police Department under the direction of the federal

3    judge.

4          Prior to my private practice, my private consultation

5    work, I spent just about ten years as the chief of law

6    enforcement for the Utah Attorney General.  The Utah Attorney

7    General has four investigative bureaus within the Attorney

8    General's Office, and I oversaw all of those investigative

9    bureaus.

10          In the early 2000s until 2005, I was a bureau chief

11   for the Utah Department of Public Safety.  That's the

12   organization that's the parent organization of our state

13   highway patrol, our state bureau of investigation, the Utah

14   Peace Officer Standards and Training Division, and a host of --

15   the Aero Bureau, so aeronautical services, helicopters and

16   planes for law enforcement use and other miscellaneous bureaus

17   like that.

18          Before that, I'd been a municipal police officer, also

19   a county deputy sheriff, and took a period of a few years to do

20   some other things.  I taught -- at J. Reuben Clark Law School,

21   I taught criminal procedure.  And also was a prosecutor.  I was

22   chief deputy county attorney in Uintah County in Utah and

23   prosecuted for a number of years.

24          That's -- I mean, we're almost back to high school

25   now.  I've worked as a dispatcher, police dispatcher, and a

```
 1    jailer.  That's pretty much my entire career.  I've been in law

 2    enforcement for 40-something years.

 3    Q.  Have you been involved at all with respect to police

 4    officer training?

 5    A.  Yes.  I -- at the -- when I was a bureau chief at the

 6    Department of Public Safety, I was a bureau chief within the

 7    state's police academy.  And so I oversaw a couple of different

 8    bureaus, the inservice training bureau and also the police K9

 9    training bureau.

10          And in conjunction with that, I also taught at the

11    police academy.  I taught constitutional law.  I taught laws of

12    the use of force, search and seizure, some sort of odd classes

13    like the Vienna Convention involving arresting foreign

14    nationals.  And essentially, if there was a legal subject, at

15    one point or another I would have taught that at the Utah

16    Police Academy.  I taught there for just about 17 years.

17    Q.  Were you involved with a Child -- Utah Child Abduction

18    Response Team?

19    A.  Yes, I was.  In --

20    Q.  What was that?

21    A.  In the early 2000s, after a child abduction in Utah, we

22    recognized that many of our -- in Utah, as I'm sure in other

23    states, many of our cities are rather small.  90 percent of our

24    police departments in Utah are 15 officers or fewer, and they

25    may not have the resources to handle a response to a child
```

1    abduction, which requires an urgent and massive response.  And

2    so working with some -- a federal grant and some partners, I

3    led the team that created the Utah CART, Child Abduction

4    Response Team.

5    Q.  Have you been involved at all in officer-involved

6    shootings?

7    A.  Yes, I have.  I've done -- well, I've done work in cases

8    like this over the years.  I currently am the chairperson of

9    the Board of Governors of the Officer-Involved Critical

10   Incident Investigation Teams of Greater Salt Lake County.  I

11   know that's a mouthful.

12          But that is the group -- I chair the group of police

13   chiefs and a sheriff that oversees four teams of 12

14   investigators each that investigate every officer-involved

15   shooting or officer-involved critical incident in Greater Salt

16   Lake County, so approximately a million people in our valley

17   and 16 or 17 police agencies.

18          I've also, as a chief deputy county attorney, overseen

19   investigations in that context, and as a law enforcement

20   officer participated as the chief investigator on a number of

21   officer-involved shootings and other critical incidents, not

22   just shootings.

23   Q.  Not -- and putting aside your work, your consulting work,

24   have you been involved in investigating officer-involved

25   shootings for other law enforcement agencies?

1   A.   Yes, I have.

2   Q.   Which ones?

3   A.   For the Uintah County Sheriff's Office, the Sevier County

4   Sheriff's Office, the Summit County Sheriff's Office.   There

5   have been a couple of other cities over the years.   Typically

6   in a situation where there are either complications or the

7   sheriff has felt that internal resources were not adequate,

8   there wasn't an experienced investigator to lead the

9   investigation, and so I agreed to step in.

10  Q.   Have you been involved at all with respect to

11  officer-involved shooting investigations for LA County?

12  A.   I have consulted on shootings in LA County, yes.   Not

13  provided direct investigative services but in a situation very

14  much like this one.

15  Q.   When did you start doing consulting work on civil

16  litigation?

17  A.   It was approximately 1998.   There was a shooting that --

18  Q.   You don't need to go into the details.

19  A.   Okay.

20  Q.   Okay.   About how many cases have you provided expert

21  opinions on with respect to officer-involved shootings?

22  A.   Over that full span since 1998?

23  Q.   Yeah.   If you know.

24  A.   Many dozens.

25  Q.   Have there ever been situations where you've been asked to

1   provide an opinion with respect to an officer-involved shooting

2   and you ended up not taking the case?

3   A.   There have been situations where I've given my initial

4   opinion, and either I wouldn't agree to work, or after giving

5   my opinion, I was not invited to work on that case.

6   Q.   And you were hired in this case to take a look at the

7   evidence to make a determination regarding use of force,

8   correct?

9   A.   Yes, sir.

10   Q.   And what information do you typically -- I'll ask you, what

11   information did you look at in this case with respect to your

12   opinion?

13   A.   I'd have to look at my report to give you a full, accurate

14   list.   But in this case, as is often the case, there were

15   voluminous police reports.   There were photographs.   There were

16   interviews with persons involved.   There were sworn

17   depositions, testimony taken in depositions.   Diagrams.   As I

18   do in some cases, I actually visited the scene where this

19   occurred and walked through and inspected the area myself.

20          And I looked at things such as the radio logs, the

21   radio calls, listened to those, looked at the dispatch logs.

22   Fairly typical -- this case brought to me a fairly typical

23   package of the documents and the records and the materials that

24   I would expect to see.

25   Q.   Did you say you actually went to the scene?

1    A.  Yes, sir, I did.

2    Q.  And why did you do that?

3    A.  Well, although diagrams and photographs are helpful and,

4    you know, I try to do my best from them, nothing can replace

5    standing and walking and having the same field of vision and

6    getting the same sense of distance and also, in this case, as

7    is often the case, in this case, going to the location, I got a

8    very good sense of what kind of facility this was where it was

9    happening.

10        MR. STRUCK:  Your Honor, if -- and I apologize for not

11   having it up there for him.  Exhibit 241 is his report, just in

12   case he needs to refer to it.

13        THE COURT:  Okay.

14   BY MR. STRUCK:

15   Q.  Now, after reviewing all the facts that you were provided

16   in this case, did you reach an opinion as to whether or not the

17   use of force by Lieutenant Ouimette was reasonable?

18   A.  Yes, I did.

19   Q.  And what was that opinion?

20   A.  My opinion was that his use of force was reasonable.  It

21   was consistent with what I would expect for an officer to do in

22   the circumstances that he faced, the things that he knew at the

23   time.

24   Q.  Okay.  And when you're reviewing these types of situations,

25   whether it be in a -- consulting in a civil case like this or

**KEN WALLENTINE - DIRECT EXAMINATION**

1    doing -- investigating an officer-involved shooting, from what

2    perspective do you need to review the facts?

3    A.  I do my very best to look at it from the perspective of

4    what the officer or officers knew at the time.  And, you know,

5    we always learn more after the fact in really any circumstance,

6    but particularly in a critical incident or a shooting.  But

7    it's my task to look at this with the lens of the officer and

8    what that particular officer knew, what information she or he

9    had been provided with at the moment that the situation

10   unfolded.

11   Q.  And we've heard throughout the trial from time to time that

12   the reasonable officer should not be judged by 20/20 hindsight.

13   What does that mean?

14   A.  Well, it's a principle of fairness and also a principle of

15   law that means that the things that I learn afterwards, that

16   the officer could not have known, did not know, it's unfair for

17   me to render a judgment as to the reasonableness -- well, me or

18   anyone else, frankly -- to render a judgment as to the

19   reasonableness of the officer's conduct based on things the

20   officer could not possibly have known or did not know.

21   Q.  And when you're reviewing the facts in this particular

22   case, particularly with respect to what Officer or Lieutenant

23   Ouimette knew, do you just look at one fact here, one fact

24   here, or do you look at the totality of the facts together?

25   A.  My task in this case or in any investigation is to look at

1    the totality of the circumstances.  It would be patently unfair

2    to parse out individual facts.  I couldn't do a good

3    investigation that way.

4    Q.  And in this particular case, the -- what was the first

5    piece of evidence that you looked at with respect to what

6    Lieutenant Ouimette, the information that he had?

7    A.  The first thing I looked at in this case, first thing I

8    look at really in every case, is what brought the police to the

9    situation.  What caused the police to attend to or to pay

10   attention to.

11          So in this case, it was a radio dispatch call.  It

12   was -- we call them calls for service.  It was a call for

13   service.

14   Q.  What's a 211?

15   A.  Well, a 211 is a really common shorthand on the radio we

16   use -- cops love acronyms, and we love codes.  And 211's a code

17   for an armed robbery.

18   Q.  Now, in this particular instance, we know that the actual

19   call was preceded by a hot tone.  Is that significant to you

20   with respect to Lieutenant Ouimette's knowledge regarding this

21   case?

22   A.  Yes.  A hot tone is a -- it can vary.  It's usually a

23   warble.  It's an audible tone that's infrequently, almost

24   rarely, broadcast over the radio.  And it -- it conveys to any

25   officer hearing it, hear this.  Pay attention.  Something very

1   serious is about to be communicated to you.  This is an urgent

2   emergency.

3   Q.  Now, what on the initial radio call, what information was

4   relayed out to the officers, including Lieutenant Ouimette,

5   that was significant in this case?

6   A.  That there had been a robbery, that the person who

7   committed the robbery said that he had a gun, said that he was

8   a killer.  There was a description given of the suspect, said

9   that the suspect had -- I don't recall the exact language of

10  the radio broadcast.  I believe it was a computer bag or a

11  messenger bag, a black over-the-shoulder bag of --

12  Q.  And let me just stop you right there.

13          On the radio call, there was some information with

14  respect to the jumping up on a pharmacy counter.  Do you

15  remember that?

16  A.  Yes.  The dispatcher broadcast to the officers in the field

17  that the suspect had jumped up over the pharmacy counter to get

18  behind, into the pharmacist area.  In other words, he vaulted

19  the counter.

20  Q.  And how is that, in this case, how is that significant to

21  you in reaching your conclusion?

22  A.  It's significant in the way that the robbery is conducted.

23  I mean, it's kind of -- it's shock and awe.  It's a show of

24  determination.  It's a show of forceful intent to commit a

25  violent act, to commit a robbery, and it's something that

1    officers adhere and pay attention to, and typically an officer

2    would interpret that jumping the counter or jumping over the

3    counter as a -- not so much a sign of danger but a sign of

4    intensity.

5    Q.  Does it say anything to you with respect to what the -- the

6    desperate nature of the crime?

7    A.  Yes.

8    Q.  When an officer is hearing over the radio that there's an

9    armed robber with a gun who's threatening to kill people, even

10   though a gun wasn't seen, is that still something that should

11   be taken seriously?

12   A.  Yes.  Absolutely.

13   Q.  Why?  Why is that?

14   A.  Someone who has engaged in a crime with that intensity -- I

15   mean, armed robbery is -- you know, sort of in the scale of

16   things that cause concern for law enforcement officers as an

17   urgent, unfolding crime, it's up there.  But an armed robbery

18   with a gun and someone who said, "I'm going to kill people" and

19   committed it with that kind of force, that vaulting and that

20   intensity, that's a person that a police officer, if he hears

21   that information, should -- I mean, it may be obvious, but the

22   police officer's thinking, I got to get that guy.  We've got

23   to -- we would use the expression, we would say we got to

24   contain this.  We've got to capture the person quickly.

25   Q.  With respect to an officer's sense of concern, would the

1    facts as were relayed on the radio call lead an officer to have

2    a heightened level or just a regular level of concern with

3    respect to what's going on here?

4    A.  No.  This wouldn't -- an officer should have a very

5    heightened level of concern given everything that we've just

6    spoken about, the -- I mean, at first the dispatcher has made a

7    determination as to the intensity, the desperation of the

8    crime.  Because the dispatcher's the one who controls,

9    according to protocols, whether that hot tone, that urgent

10   alert, is given.

11        And then the officer takes that into account and adds

12   on to it all of the other things that we've described, the

13   report of a gun, they know that I'm a killer, and so forth.

14   Q.  Now, moving on to the encounter at the Jack in the Box

15   parking lot, what, in your view, is significant with respect to

16   your opinion that occurred in that parking lot?

17   A.  Well, there are a couple of different factors.  First, when

18   the first officer at the Jack in the Box parking lot, Officer

19   Spencer, saw the suspect, he saw that, as did Lieutenant

20   Ouimette, the suspect had removed his shirt.

21        We see that.  We see people taking off a shirt, we see

22   people turning clothing inside out, putting on a jacket,

23   tossing things to the side to -- you know, to change

24   appearance.  And so the fact that the guy is missing his shirt,

25   that's a -- we would say that's a clue.

KEN WALLENTINE - DIRECT EXAMINATION

1          Another thing that was significant to me in the

2   interaction with Officer Spencer was that when Officer Spencer

3   looked at the suspect and spoke to him and said, "Hey, can I

4   talk to you for a minute," the suspect said, "Why?"  And then

5   as Lieutenant Ouimette showed up, the suspect bolted, took off.

6   That's very significant to me.

7   Q.  And was there any -- I guess, did Lieutenant Ouimette do

8   anything when he saw the suspect?

9   A.  He did.  Lieutenant Ouimette, who also, I should mention,

10  they both -- both of them had their emergency lights on on

11  their car.  When he saw the suspect take off, he tried to at

12  first parallel him with his patrol vehicle and head him off at

13  the pass, cut him off with the car as Officer Spencer began to

14  chase after him.

15  Q.  All right.  With respect to any descriptions that were

16  called out, did Lieutenant Ouimette -- do you remember whether

17  or not he did or did not call for a description of the pants?

18  A.  He did.  He called and tried to confirm the description

19  from the dispatcher.

20  Q.  And why would an officer do that?

21  A.  Although all of the circumstances are -- I think would lead

22  an officer to believe this is the suspect, you know, we want

23  to -- we want to have every -- every bit, every piece of

24  information available to the dispatcher before we engage in

25  what was about to be an attempted detention here.

1    Q.  And when the suspect took off running, what does that --

2    what would that tell a reasonable officer?

3    A.  Well, any officer in that circumstance, after that kind of

4    a call, would confirm in her or his mind, that's very likely

5    that is the suspect.

6    Q.  We know from the evidence that Mr. Hollins ran onto the

7    campus of the Westchester care facility.  How is that

8    significant with respect to what a reasonable officer would do

9    in this situation?

10   A.  It's significant because of the population that, first, as

11   reported to me and then I observed when I went there, the

12   population at that location.  It's a mixed -- it's a mixed

13   facility.  And so there are senior citizens living in

14   essentially senior housing there, but there are also

15   nonambulatory people in assisted living, and there's also, I

16   think the proper term is hospice.  Highly dependent individuals

17   in medical care that are -- well, they can't take care of

18   themselves.  They're nonambulatory.

19   Q.  And with respect to the nature of the facility, how does

20   that enter into the picture regarding the ability to, I think

21   you said, contain the suspect?

22   A.  Well, it's a pretty good size facility, and it's -- I'm not

23   sure of the right way to describe it.  There are lots of

24   buildings and passageways and parking lots and breezeways.

25   It's a bit of a spread-out challenge.  It's not an easy place

1    to contain for responding officers.  A lot of places to turn, a

2    lot of places to run, lot of places to hide.

3    Q.  And with respect to the population there, does that enter

4    into the equation for a reasonable officer regarding this

5    situation?

6    A.  It does.  I mean, the officers -- they're not going to know

7    exactly, you know, what's behind each door.  They're not going

8    to know whether it's a completely nonambulatory person in a bed

9    or somebody in a wheelchair or somebody who is just in an

10   assisted living where someone comes in to clean and cook and

11   that kind of thing.

12   Q.  But in terms of an officer who -- in this case, Lieutenant

13   Ouimette -- who's in pursuit in this situation, how does that

14   change the equation regarding what he's trying to do here?

15   A.  His task, his job one here, is to protect the public.  His

16   primary objective is to capture that suspect that he believes

17   was the robber.  And he now has a suspect going into a place

18   where it is ripe with opportunities to take hostages, to

19   barricade, and so there is an urgency and an expediency for

20   Lieutenant Ouimette in capturing that suspect.

21   Q.  In this particular case, did you see any evidence with

22   respect to Lieutenant Ouimette actually seeing the suspect

23   trying to get into the acute care center?

24   A.  I did.  The materials that I reviewed indicated that the

25   suspect actually tried to enter one of the doors of -- I don't

1   know if it was in the exact center, but it was toward the core

2   of the facility itself, one of the medical clinic-type areas.

3   Q.  And how does that affect the thought process of the

4   reasonable officer as he's pursuing this suspect who's believed

5   to be armed and willing to kill people?

6   A.  The reasonable officer in that situation, again, if I could

7   give you the example of there's a dial, we're just about to the

8   top of the dial of concern.  It is such a complicated, thorny

9   problem if the suspect can get into that kind of a facility,

10  and the door where he was -- the door where he was trying to

11  go, when I went there, I could see that this was a place where

12  people were being taken in and out in wheelchairs and there

13  were a number of nurses and medical staff.

14          This wasn't just assisted living.  This wasn't just a

15  senior home.  The actual building that he was going into was,

16  again, a care-providing kind of clinic.  That's the last -- one

17  of the last places an officer would ever want to be pursuing a

18  suspect.  That's just -- that's just a recipe for danger and

19  disaster.

20  Q.  In terms of a dangerous situation with respect to an armed

21  suspect in a hostage situation, can you think of even any worse

22  situation than this?

23  A.  Yeah, I gave the example once, I -- I think about the only

24  place that might be worse would be a children's cancer ward

25  where kids are receiving, you know, treatment, where they've

1    got IVs and lines in them, and moving them at all presents a

2    significant risk.  That's -- that might be worse.

3    Q.  Now, in this case, we've heard evidence, and it's

4    undisputed that Lieutenant Ouimette gave a warning to the

5    suspect.  Was that -- what's your opinion on that?

6    A.  We teach officers, we have for years, we teach officers

7    that when it's feasible, when it's not tactically unreasonable,

8    that they should give a warning before using force.  It --

9    sometimes it works.  Often it does.

10   Q.  In this particular situation, Lieutenant Ouimette has

11   testified that Mr. Hollins turned, was running perpendicular to

12   him, and turned to look at him.  What -- why is that

13   significant, in your view?

14              MR. BURSH:  Objection, Your Honor.  I think he should

15   just ask the question, why is that significant in this case?

16              THE COURT:  Overruled.

17              THE WITNESS:  It's significant in a couple of

18   respects.  The first reason that it's significant is we refer

19   to that as targeting behavior.  It's --

20   BY MR. STRUCK:

21   Q.  What do you mean by "targeting behavior"?

22   A.  I mean if a suspect is running, is fleeing away, and then

23   interrupts that flight to turn and to look at the officer,

24   officers are taught to understand, that suspect is likely

25   targeting them.  That is a -- we teach officers to understand,

1    that's a cue that very likely you're about to be the target of

2    some aggressive force.  It allows the suspect to orient the

3    location of the officer.

4          I mean, the word "targeting" is -- that's the word we

5    use in training, because that's exactly what it is.  It's like,

6    I now know where you're at exactly, and I'm looking at you in

7    preparation for something, and that's what we teach officers,

8    to see that as a very significant danger cue.

9    Q.  And in this particular situation, the evidence in this case

10   from Lieutenant Ouimette is as he was targeting him, his right

11   hand went up with a black gun in it.

12   A.  Yes.

13   Q.  All right.  And that was the point in time in which he

14   determined that he needed to fire his weapon?

15   A.  He recognized, based on everything that he had been told

16   about the suspect, all of the material, all of the information

17   that we've covered, that this is a person who's committed an

18   armed robbery, this is a person who committed an armed robbery

19   with intensity, I would not disagree with your word

20   "desperation," jumping on the counter, who said that he had a

21   gun, said he was a killer, and who now has fled at the sight of

22   two officers who have just asked to speak with him and fled

23   into this -- this environment that presents this thorny,

24   complicated tactical problem for officers, has now stopped,

25   engaged in what we teach officers to be targeting behavior, and

1    has engaged in body mechanics that are consistent with and we

2    teach officers, and they're exactly alike, we teach officers to

3    draw and fire a gun.  That's why it was significant.

4    Q.  What is action -- have you ever heard "action beats

5    reaction"?

6    A.  Yes.

7    Q.  What does that mean?

8    A.  Well, in the strict sense, it's -- action -- action beats

9    reaction is a principle of physics.  It's a principle of

10   chemistry.  In the scientific world, they express it like this:

11   Stimulus always precedes response.

12          MR. BURSH:  Your Honor, I'm objecting on foundation.

13   Disclosure.

14          THE COURT:  Disclosure?

15          MR. BURSH:  Well, let's start with foundation.

16          THE COURT:  What foundation is lacking?

17          MR. BURSH:  He's not a scientist.  He hasn't laid any

18   kind of foundation to discuss physics.

19          THE COURT:  Overruled.

20          THE WITNESS:  In the police world, we use the phrase

21   "action beats reaction" to illustrate the principle that the

22   person who is taking action will always take that action before

23   the person who has to react can react, the simple expedient

24   that I can't react until I perceive the action that you're

25   taking and then orient myself to that action.

1   BY MR. STRUCK:

2   Q.  Now, in this particular case, we know that the bullet fired

3   by Lieutenant Ouimette entered Dalvin Hollins's upper left

4   back.  Correct?

5   A.  That's my understanding from the medical examiner.

6   Q.  How does your opinion that Officer or Lieutenant Ouimette's

7   actions were reasonable in this situation, how does it -- how

8   is that the case if the bullet enters his back?

9            MR. BURSH:  Objection, Your Honor.  I think this is

10  getting --

11           THE COURT:  Sustained.

12           MR. STRUCK:  Your Honor, it's --

13           THE COURT:  It's not a lack of disclosure.  It's my

14  ruling on it earlier.

15           MR. STRUCK:  I understand, but I have to lay some

16  foundation for --

17           THE COURT:  You can lay some foundation without

18  talking about this specific case.  You're going to get an

19  opinion from him as to whether or not he thought what was done

20  was appropriate, and that's not -- that's for the jury to

21  decide.  You can talk about perception-reaction time if that's

22  what you want to do, but he's not here to tell a jury what

23  their decision should be.

24           MR. STRUCK:  I understand.  Thank you, Your Honor.

25

KEN WALLENTINE - DIRECT EXAMINATION

1    BY MR. STRUCK:

2    Q.  What is perception-reaction time with respect to law

3    enforcement?  Was does that mean in use of force type

4    situations like this?

5    A.  When we talk about perception-reaction time, we're really

6    talking about response time.  And it's -- in law enforcement or

7    other circumstances, perception-reaction time is comprised of

8    the time that it takes for me to perceive a circumstance or a

9    set of circumstances and then select a response.  In other

10   words, to react.

11        All of that takes time, and so when we talk about

12   reaction time, we're talking really about perception and

13   reaction, and really, it's more accurate to say its response

14   time.

15   Q.  And with respect to perception-reaction in an

16   officer-involved shooting case like this, can you tell us how

17   long it would -- it takes for an assailant, from a fully

18   frontal position, to turn 180 degrees?  How long would that

19   take?

20        MR. BURSH:  Objection.  Objection, Your Honor.  It's

21   back to this case again.

22        THE COURT:  He can answer that question, but I think

23   you need to ask him more general -- not every assailant's the

24   same, so I think you need to ask it what is something about

25   this without asking as if it's -- every assailant moves the

1    same speed.

2    BY MR. STRUCK:

3    Q.  Okay.  With respect to perception-reaction time in an

4    officer-involved shooting, how long does it take -- how long

5    has research said it takes, based upon your review of

6    materials, someone to turn 180 degrees?

7    A.  There are published studies that are generally accepted in

8    the community that indicate that a person may turn, an

9    assailant, a suspect, can turn 180 degrees and begin to rotate

10   back again in .33 seconds, or a third of a second, a blink of

11   an eye.

12   Q.  And what do these research studies show with respect to how

13   soon it takes for somebody in an officer's position to perceive

14   the threat, decide to use deadly force, and pull the trigger?

15   A.  Again, there are multiple studies on this, and giving

16   the -- in studies with which I'm familiar, giving the suspect

17   every benefit of the doubt, if you will, that is, in situations

18   where the officer knows that there's going to be a stimulus, so

19   to be fair, it's -- the officer's not going to be terribly

20   surprised, the officer knows that there's going to be a

21   stimulus, a signal to draw and to use deadly force, the best

22   time is .59 seconds.  In other words, not quite two-thirds of a

23   second, six-tenths of a second.

24   Q.  So in other words, somebody who the officer is perceiving

25   to be pointing a gun at him can point the gun at him and then

KEN WALLENTINE - DIRECT EXAMINATION

1    turn around before the officer is able to perceive the threat,

2    decide to shoot the weapon, and then fire the weapon?

3    A.  Correct.

4    Q.  All right.  And are these peer-reviewed studies?

5    A.  Yes.

6    Q.  What's pattern recognition?  What does that mean?

7    A.  Pattern recognition is -- it is seeing a set of

8    circumstances, a set of behaviors, a set of signals, a set of

9    stimuli, and recognizing the pattern, and then if there's a

10   blank at the end, filling in the blank.

11          It is, to be -- I mean, just to really take it to its

12   basic level, if it walks like a duck, if it looks like a duck,

13   if it quacks like a duck, that's a pattern.  So for me to say

14   it is almost certainly a duck, that's pattern recognition.

15   Q.  And how is that significant in this case?

16   A.  Because we train officers -- you know, we can't train

17   officers for every single incident that they're ever going to

18   encounter in their entire career, be it 20 years or 40 years.

19   So we train officers to assess and recognize patterns, and then

20   they engage in what we call recognition-primed decision-making.

21          In other words, they recognize a pattern and they make

22   their decision in just incredibly compressed amounts of time in

23   accordance with a pattern that they've observed in training or

24   in prior circumstances.

25   Q.  And how is that significant in this case?  How is that

1   relevant in this case?

2   A.  Because in this case, Lieutenant Ouimette had been in

3   training and he had been trained that that kind of behavior

4   from a person, from a suspect believed to have committed an

5   armed robbery, who had committed an armed robbery, that

6   turning, that moving, that "presentation" is the term we use,

7   presentation meaning the physical maneuvering, to be consistent

8   with drawing a gun, that's a pattern.

9           I have a person who says they have a gun.  I have a

10  person who says they're a killer.  I have a person who's run

11  from me.  I have a person who has made some attempt to change

12  his appearance from the time of the armed robbery, who now is

13  reaching down and engaging in a physical motion consistent with

14  drawing a gun.

15          All of that -- and that's a pattern, and all of that,

16  we train officers, the principle here is action beats reaction,

17  so you've got to do your very best to get ahead of that

18  decision-making process.  That is, you've got to see the

19  pattern, recognize the pattern.  We prime you to take action by

20  recognizing a pattern.

21          It's significant because Lieutenant Ouimette saw a

22  pattern, recognized it, and took the appropriate response that

23  we train officers to take for that particular pattern.

24  Q.  Now, after the shot was fired, Mr. Wallentine, there were

25  actions that were taken by Lieutenant Ouimette.  What actions

1   did Lieutenant Ouimette take that you believe were consistent

2   with his belief that Mr. Hollins was armed with a gun?

3   A.  Well, as I mentioned earlier, his job one is to protect

4   those people inside that care center.  And he -- one of the

5   first things he did was he called out on the radio for

6   additional resources.  He talked about four-pointing.  In other

7   words, he talked about establishing a perimeter.

8           He went to the door and banged on the door until one

9   of the medical staff opened the door, and he told them,

10  "There's a man now in your facility with a gun.  Get out."  I

11  mean, that's obviously highly consistent with his belief that

12  he had an armed --

13          MR. BURSH:  Objection, Your Honor.  I think this is

14  speculation, talking about "consistent with his belief."

15  Doesn't know what he believed.

16          THE COURT:  Overruled.

17  BY MR. STRUCK:

18  Q.  Go ahead.

19  A.  That's consistent with what a reasonable officer would do

20  in terms of I -- maybe you haven't heard the term four-point,

21  but establishing a perimeter, to exclude other people from

22  getting in there and to contain the suspect so the suspect

23  can't get into one of the other buildings.

24          He actually held, he had his weapon at the ready to

25  protect those people that he was encouraging to get out.  He's

1   on the radio.  I mean, he's performing a multitude of tasks at

2   the same time.  He's on the radio calling for tactical

3   assistance.  They're getting tactical resources.  They're

4   inquiring about a K9, a helicopter, everything that they could.

5             Those are the behaviors that, well, I would expect

6   from any one of my officers in that kind of a situation where

7   the officer believed that he, at the time, had an armed

8   assailant loose in that care center.

9   Q.  Did you see anything in the evidence that you looked at

10  that suggested to you that Lieutenant Ouimette didn't believe

11  that Mr. Hollins was armed with a gun?

12            MR. BURSH:  Objection.  Speculation.

13            THE COURT:  Sustained.

14  BY MR. STRUCK:

15  Q.  Was there anything inconsistent with an officer -- did he

16  do anything inconsistent with an officer -- inconsistent with

17  respect to this belief that there needed to be containment and

18  that there was a threat in the building?

19            MR. BURSH:  Objection.  Speculation.

20            THE COURT:  Overruled.

21            THE WITNESS:  He did not.

22  BY MR. STRUCK:

23  Q.  And you reviewed the entire situation from start to finish?

24  A.  I reviewed all of the materials available to me from start

25  to finish.

1    Q.  And you also reviewed the -- any post-incident interviews?

2    A.  I did.  I reviewed the post-incident interviews, the

3    investigative reports, all of the diagrams that were created

4    after the fact, the photographs that were taken after the fact.

5    Q.  In terms of the amount of time -- well, strike that.

6           Mr. Wallentine, in your opinion, did Lieutenant

7    Ouimette utilize reasonable force when utilizing deadly force

8    when confronted with Mr. Hollins?

9    A.  Yes.

10          MR. STRUCK:  Thank you.

11          THE COURT:  Cross-examination.

12          MR. BURSH:  Thank you, Your Honor.

13                      CROSS-EXAMINATION

14   BY MR. BURSH:

15   Q.  Good afternoon, Mr. Wallentine.

16   A.  Good afternoon.

17   Q.  We've met before, right?

18   A.  Yes, sir, we have.

19   Q.  Part of your job in this case was to weigh certain

20   inconsistencies with respect to whether certain allegations

21   that have been made are consistent or inconsistent with the

22   physical evidence.  Right?

23   A.  Part of my job here was to take a look at the evidence, and

24   where there were conflicts in evidence or perceived conflicts

25   in evidence, to try and resolve those, if I could.

1   Q.  If you could?

2   A.  Sure.  If I could.

3   Q.  Well, we've been here for a week, and we're trying to

4   resolve the conflict of the gun.  Where is the gun, sir?

5   A.  I don't know.

6   Q.  That's important, isn't it?

7   A.  It would certainly be helpful to the analysis if there was

8   a gun sitting before me.

9   Q.  Right.  Because as you said, if it walks like a duck,

10  quacks like a duck, then it's probably a duck.  Right?

11  A.  Generally, it is.

12  Q.  That's kind of a common sense thing as opposed to all this

13  high-tech talk about policing, right?

14  A.  Well, it's a common sense way of explaining pattern

15  recognition, which is -- you know, I guess maybe it sounds

16  high-tech, but it's really something all of us do every day.

17  Q.  Sure.  And so just like when your kid tells you a story and

18  it doesn't check out, you have to do a little investigating,

19  right?

20  A.  I'm well past that day, but I got a couple of grandkids

21  that I help babysit.  Yeah, sure.

22  Q.  Okay.  So you've come in here to testify, and you've done a

23  couple of things right out of the gate, right?  One of them is,

24  you've taken Lieutenant Ouimette's version of facts as true.

25  Right?

KEN WALLENTINE - CROSS-EXAMINATION                           38

1    A.  I think that I'd have to take a look at the entire -- and

2    there's quite an interview -- but generally, I certainly

3    believe he's truthful.

4    Q.  Well, let's break that down.

5            He promised us and he told us that there was a gun.

6    Are you willing to admit, sir, that based on the evidence that

7    you reviewed, that Dalvin Hollins was unarmed at the time he

8    was shot in the back by Lieutenant Ouimette?

9    A.  I don't know.  I know that a gun was not located.  I know

10   his behavior was consistent with having a gun, but I don't know

11   whether he had a gun.

12   Q.  That's inconsistent with the physical evidence in this

13   case, correct?

14   A.  It's inconsistent to say that -- well, it's consistent to

15   say that I don't have a gun in front of me and that I don't

16   know whether he had a gun.  I can only say that he behaved as

17   if he had a gun, he said he had a gun, and he acted physically

18   like he had a gun.  But I do not know whether he had a gun.

19   Q.  And the dispatcher that you talked about on direct said

20   that no gun was seen.  Right?

21   A.  That's correct.  She did.

22   Q.  And that is part of the totality of the circumstances as

23   well, correct?

24   A.  Yes.  The officers asked who had seen the gun, and the

25   dispatcher was not able to say that anyone had at that point.

1    Q.  Now, as I sat and listened to you testify, and you're

2    talking about this time/reaction concept, are you telling us

3    that an officer pursuing a robbery -- armed robbery suspect

4    needs to get the jump on the suspect and be ready to shoot

5    first?  Is that what you're telling us?

6    A.  I don't think that's anything remotely like what I said.

7    I'm not quite sure where you're coming from.

8    Q.  Okay.  Well, I'm asking you a question.  I'm asking you --

9    A.  That's -- okay.  That is clearly not what I said, if that's

10   what you're asking.

11   Q.  Okay.  Good enough.  Just trying to clarify.

12        Because you were talking about the time that it takes

13   an officer to recognize that somebody's making a movement and

14   then react to it, and you talked about why he has to anticipate

15   a move, so I'm trying to figure out from you, how does that tie

16   in with deescalation?

17   A.  Well, there's a couple principles at work.  You know, I

18   don't know how more clearly I can say that whether you're

19   talking about a police officer's perception or a principle of

20   science or physics, action will always beat reaction.  Stimulus

21   will always precede a response to the stimulus.

22        Deescalation is a concept that is, I suppose,

23   tangentially related.  Deescalation is a concept that requires

24   some sort of a willingness by both parties, really, to engage

25   into a dialogue.

1   Q.   Now --

2   A.   Generally speaking.  I mean, you're talking about a

3   30,000-foot concept there.

4   Q.   Well, and one principle of deescalation is to buy some

5   time, right?

6   A.   That's often -- well, buying time is often giving an

7   advantage to the opportunity to deescalate, assuming that, you

8   know, you've got two or more parties that have the same level

9   of willingness or a similar level of willingness to engage into

10  a conversation.

11  Q.   Did you review the report that was authored by Detective --

12  then-Detective, now-Lieutenant Akey in this case?

13  A.   I believe so, but I don't remember.  I don't remember --

14  well, congratulations to him if he's been promoted.  I don't

15  remember what his title was at the time.

16  Q.   Okay.  Well, let me ask you this way:  Do you know whether

17  or not it took Lieutenant Ouimette a minute and 43 seconds to

18  spot Dalvin Hollins, chase him, and shoot him?  Yes or no?  If

19  you know, you know; if you don't, you don't.

20  A.   I don't recall a time sequencing as you've described it.

21  It may well have been in that realm.

22  Q.   Wasn't it your opinion that Dalvin Hollins actually walked

23  from Walgreens to Rural and Guadalupe, which is one mile away?

24  Isn't that your opinion in your report?

25  A.   No.

1    Q.  Can you get your report?

2    A.  Sure.

3          I have my report, which is -- well, not quite sure the

4    number.

5    Q.  I'm going to come back to that.

6          As part of your investigation, did you review

7    Lieutenant Thompson's report?

8    A.  I remember reviewing the police reports, but I don't

9    recall -- I don't recall the authors of each specific report.

10   Q.  And with respect to your report, I think as we got it

11   listed in here is Exhibit 63.

12   A.  I don't know.

13   Q.  Do you have it up there, your report?

14   A.  I do.  I think it's 241, Exhibit No. 241.

15   Q.  Well, in any event, I want you to look at page 6 down at

16   the bottom.

17   A.  All right.  I'm on page 6.

18   Q.  Doesn't it say -- you see where it says Lieutenant Ouimette

19   encountered -- just before he saw Hollins, 19 minutes had

20   passed, and the suspect could be anywhere.  And it says, in

21   fact, a casual walk --

22          THE COURT:  Talk into the microphone, please.

23   BY MR. BURSH:

24   Q.  I'm sorry.  A casual walk from the Walgreens pharmacy where

25   Hollins committed the robbery to the point that Officer Spencer

1    and Lieutenant Ouimette saw Hollins could take just about 19

2    minutes.

3              Didn't you say that?

4    A.  I did.

5    Q.  And then you said:  A walk coupled with a jog or sprint

6    would take much less time.

7              Do you read that?

8    A.  Yeah, if you jog or sprint, it typically will be quicker.

9    Q.  So based on what I read, I mean, I'm trying to -- you seem

10   to be suggesting that Dalvin Hollins didn't run or sprint to

11   the intersection where he encountered Officer Spencer and

12   Lieutenant Ouimette.  Instead, he walked.

13             Is that your -- what you read in this?

14   A.  No.  You're quite incorrect.

15   Q.  Well, then you read it.

16   A.  So when I went -- when I went there, and I still think that

17   a walk from the Walgreens pharmacy to the Jack in the Box

18   parking lot can be accomplished in 19 minutes.  I stand by

19   that.  I think that it can.  I stand by my belief that if you

20   walk and jog and sprint and zig and zag, that that would take

21   less time.

22             But I don't know the precise path that Hollins took.

23   But I do stand by, and I'm quite confident, I'm 60 -- well, I'm

24   much older than Hollins.  I can do it in 19 minutes.  I think

25   most people can.

1   Q.  And I think what you were -- well, you tell me.  Were you

2   trying to suggest that it was likely that by the time -- by the

3   time analysis that it took him to get a mile away, that in 19

4   minutes, it would suggest that a guy like Hollins would have

5   probably more likely walked as opposed to sprinted that mile?

6   A.  I'm not trying to suggest anything other than what I said,

7   and what I said was that I believe that it certainly is

8   possible that a person could cover the distance between where

9   your armed robbery occurred at the Walgreens to the Jack in the

10  Box in 19 minutes casually walking, but that you could make it

11  in a much shorter time if you just engaged in a jog or a sprint

12  all the way or a sprint part of the way.  That's what I've

13  written, and that's really all I'm trying to -- that's really

14  all I'm trying to say here.

15  Q.  And what's the purpose of what you're saying?

16  A.  The purpose is that 19 minutes have passed, and so it is

17  certainly conceivable that Hollins covered that distance in 19

18  minutes.

19  Q.  And a walk coupled with a jog or a sprint would take much

20  less time, right?  You wrote that, right?

21  A.  I did.

22  Q.  I'm reading right out of your report.

23  A.  Right.  So let me try and do my best.

24      I went there.  You -- I -- can walk in 19 minutes from

25  the Walgreens to the Jack in the Box.  I believe that Hollins

1    could have as well.  If someone walked that distance coupled

2    with a sprint or a jog, I think it could be done in less than

3    19 minutes, and I think that you could take a different path

4    and jog or sprint and still reach the Jack in the Box from the

5    Walgreens in 19 minutes.  That's really all I'm trying to

6    convey here.

7    Q.  You testified that the Westchester center is about the

8    worst place that an armed robbery suspect could have run onto.

9    Right?

10   A.  It's one of the worst.

11   Q.  And you likened it to like a cancer, children's cancer

12   treatment place, right?

13   A.  They have similarities.  I think they're both really bad

14   places --

15   Q.  Sure.

16   A.  -- to have a situation like this unfold.

17   Q.  Well, since we're talking about that, did you know that

18   Lieutenant Ouimette never shot Dalvin Hollins because of

19   anything that had to do with Westchester?  Did you know that?

20   A.  I'm not quite sure what that question means, but --

21   Q.  Well --

22   A.  -- I would --

23   Q.  Let me tell you what it means.  Are you familiar with the

24   reasons that Lieutenant Ouimette gave, not the ones you're

25   giving, the ones that Lieutenant Ouimette gave for why he shot

1    Dalvin Hollins?

2    A.  Although I've been sitting in the other room, I did not

3    listen to today's testimony.

4    Q.  Yeah.  That's what I thought.

5            So you don't know why Lieutenant Ouimette says he shot

6    Dalvin Hollins, right?

7    A.  Again, because I was complying with the judge's rule, I did

8    not sit in here and listen to him testify today.

9    Q.  But we did.  And so we know that Lieutenant Ouimette didn't

10   say that vulnerable people at Westchester is why I shot Dalvin

11   Hollins.

12           Do you know that?

13           MR. STRUCK:  Objection, Your Honor.  Asked and

14   answered.  He doesn't have the foundation to respond to this.

15           THE COURT:  Overruled.

16           THE WITNESS:  I didn't sit here today.  I understand

17   you're testifying about what he said, but I can't testify to

18   the veracity of your statement.  I wasn't here today.

19   BY MR. BURSH:

20   Q.  But that would be part of the totality of all of these

21   circumstances, right?

22           MR. STRUCK:  Objection, Your Honor.  I don't -- that

23   question makes no sense.

24           THE COURT:  Yeah.  Why don't you ask him -- I think

25   he's focusing too much on what was said here today.  There are

1    other areas that he might have reviewed where he would have

2    known what Lieutenant Ouimette said was the basis for it.  Why

3    don't you ask him about that.

4    BY MR. BURSH:

5    Q.  Why don't I do it this way:  Why do you think Lieutenant

6    Ouimette shot Dalvin Hollins?

7    A.  I'm not here today to talk about what was in his mind.  I

8    can tell you what a reasonable officer would do, presented with

9    someone who had committed an armed robbery, who had fled, who

10   had changed his appearance, who said that he was a killer, who

11   said that he had a gun, who ran into the Westchester senior

12   citizen center and tried to get into the care center and then

13   turned and engaged in a behavior consistent with drawing and

14   aiming a gun.

15   Q.  Now, you know there was no gun, right?

16              MR. STRUCK:  Objection.  Asked and answered.

17              THE COURT:  You've already -- haven't you covered

18   that?

19              MR. BURSH:  Yeah, he just went back there.

20              THE COURT:  What?

21              MR. BURSH:  He went back to --

22              THE COURT:  Sustained.  Let's move on.

23              MR. BURSH:  Okay.

24              THE COURT:  This a good place for a break?

25              MR. BURSH:  Yes, Your Honor.

```
 1              THE COURT:  Let's take our afternoon break.  We'll
 2    come back at 3:00.
 3              (Jury not present.)
 4              THE COURT:  Please be seated.  Sir, you can step down.
 5              Anything to take up?
 6              MR. STRUCK:  No, Your Honor.
 7              MR. BURSH:  No, Your Honor.
 8              THE COURT:  Okay.
 9              (Recess taken, 2:44 p.m. to 3:01 p.m.)
10              (Jury present.)
11              THE COURT:  Mr. Bursh, you may continue.
12              MR. BURSH:  Thank you, Your Honor.
13    BY MR. BURSH:
14    Q.  Mr. Wallentine, I was asking you before about your
15    familiarity with Lieutenant Thompson's PSB report.
16              Do you remember me talking about that?
17    A.  Yes, I remember your questions.
18    Q.  Have you looked at that?
19    A.  Pardon?
20    Q.  Have you looked at Lieutenant Thompson's PSB report that's
21    listed as Exhibit No. 66 in this case?
22    A.  I looked at the materials that are listed on the first page
23    of my report, which includes Tempe Police Department reports.
24    As I mentioned before, I don't remember the individual authors
25    of each report.
```

1    Q.  Well, I believe that you listed his report as one of the

2    Tempe Police Department reports that you reviewed.

3    A.  I may have.  Again, I don't remember the individual authors

4    of each report.

5    Q.  Well, during the break, I had Exhibit 66 placed up at the

6    podium for you to refer to.

7            Do you have it?

8    A.  Yes.  Exhibit 66 is sitting here.

9    Q.  Okay.  I want you to look at Page No. 18, and I want you to

10   look at the second paragraph under the heading "Analysis of the

11   Description."

12           Do you see that?

13   A.  I do.

14   Q.  Okay.  I'm just talking about the first sentence of that

15   paragraph.  You there with me, where it says "Ultimately"?

16   A.  Yes.

17   Q.  And it reads:  Ultimately, there is no physical evidence to

18   suggest Mr. Hollins was armed.

19           Do you read that?

20   A.  I did read that.

21   Q.  Do you disagree?

22   A.  No.  As I stated before the break, I don't know whether

23   there was a gun or not.  I can only tell you that all the

24   behaviors and statements of the suspect were consistent with

25   him having a gun.

1    Q.  And keeping in line with that line of questioning, there is

2    no one alive other than Mr. Ouimette that witnessed the

3    shooting, right?

4    A.  That is my understanding.

5    Q.  And so there's no one other than Mr. Ouimette who actually

6    claimed to have seen a gun on this day.  Right?

7    A.  Again, that's what I understand.

8    Q.  And that's because you reviewed all of these things on your

9    report to give you an idea of what's happening in this case,

10   right?

11   A.  Well, I -- my understanding comes from that.  I don't know

12   that that is necessarily --

13   Q.  Okay.

14   A.  -- an answer to your question.

15   Q.  I guess my question is, that's where you got your facts

16   from, right?

17   A.  I got my facts from the material listed in my report, yes.

18   Q.  Thank you.

19         Did you ever see anywhere in the file, after all of

20   this stuff you reviewed, where Lieutenant Ouimette ever alleged

21   that Dalvin had something else in his hand other than a gun,

22   that he mistook for a gun?

23   A.  No.

24   Q.  Based on your experience, why can't all the evidence that

25   you looked at suggest that Lieutenant Ouimette shot an unarmed

1    19-year-old in the back while he was running away?

2    A.  I think that's certainly within the realm of what the

3    evidence can suggest.  My role --

4    Q.  That's it.  I'm good with that.  Thank you.

5    A.  Well, that's not the full answer, but if you're good with

6    that.

7    Q.  Okay.

8         THE COURT:  Hold on.  You asked him why.  Let him

9    finish his answer.

10        Go ahead and finish.

11        THE WITNESS:  My role is not to take their place and

12   decide what happened.  I'm simply here to talk about the

13   consistency of the behaviors based on all of the factors that

14   I've been over a number of times.

15   BY MR. BURSH:

16   Q.  Now, when you talk about that concept of the totality of

17   circumstances, isn't it really the totality of circumstances

18   known to Lieutenant Ouimette that matters?

19   A.  It's the totality of the circumstances known to or

20   reasonably believed by the officer who is at the moment making

21   the decision to use force.

22   Q.  Right.

23   A.  That's what the law tells us.

24   Q.  Sure.  And in this case, the only one that used force on

25   Dalvin Hollins is Lieutenant Ouimette.

1    A.  In this incident, yes.

2    Q.  Thank you.

3           It says on your report that you reviewed the

4    deposition of Assistant Chief Angel Carbajal.

5           Do you remember anything about his deposition?

6    A.  I don't remember the name.  I remember the title, yes.

7           No, I don't.  It's been now about four years since I

8    reviewed that.

9    Q.  Sure.

10          Let me ask it this way:  Do you agree that judgmental

11   training is the best way to avoid unlawful shootings?

12   A.  No.

13   Q.  Okay.  What is judgmental training?

14   A.  Judgmental training can take a variety of forms.

15   Typically, when we in law enforcement as trainers talk about

16   judgmental training, we're talking about scenario-based

17   training.  So we're talking about giving officers particular

18   scenarios.  I mentioned at the beginning of my testimony, we

19   can't train officers on every single event that they're going

20   to encounter, so judgmental training is an effort to provide

21   scenarios, sometimes of common incidents, incidents more

22   commonly than not.

23          So you may have judgmental training for an officer to

24   deal with something that happens frequently or infrequently.

25   But judgmental training usually means scenario-based training,

1   much like what I administered during the time that I ran the

2   training center for the Office of the Attorney General in Utah.

3   Q.  Okay.  So let me ask you this way:  You're not here to tell

4   this jury you think it's a good idea for an officer who hardly

5   ever gets involved in a high-stress, dynamic situation to go

6   untrained on judgmental training for 20 months and get himself

7   involved in a dynamic, high-stress situation like the one we're

8   here for today?

9   A.  I'm happy to talk about judgmental training and --

10  Q.  No, I'm asking you about that question.

11        You don't think that's a good idea to go 20 months

12  with no training and then get yourself involved in a

13  high-stress situation like this one?  Is that what you're

14  teaching up in Utah, sir?

15        MR. STRUCK:  Objection, Your Honor.  Argumentative.

16        THE COURT:  Sustained.  That's compound.  Why don't

17  you just ask one question at a time.

18  BY MR. BURSH:

19  Q.  Well, you're not here to tell this jury you think it's a

20  good idea for an officer to go untrained on judgmental for 20

21  consecutive months and then get himself involved in this type

22  of situation?

23  A.  Put that way, no.  But that's not a fair answer.  For

24  example, as I mentioned, many of our departments in Utah are

25  fairly small.  Judgmental training is not required.  It's kind

1    of the icing on the cake for those who can.  And --

2    Q.  What police officer --

3    A.  -- 20 months is not unusual, frankly, for someone not to

4    have the exposure to scenario-based training.  It's just not.

5    Q.  And, sir, you don't know what all is required at Tempe, do

6    you?

7    A.  I reviewed the judgmental training scenarios.

8    Q.  I'm not talking about the scenarios.  What I'm asking you

9    is, you don't know what the requirements are as talked about by

10   Angel Carbajal, the assistant chief; you don't know those as

11   you sit here today?

12   A.  I do recall the scenarios that were administered.

13   Q.  I'm sorry, sir.  That's not question.  I'm not going to let

14   you get into an analysis on the scenarios.  I just want you to

15   answer whether or not --

16   A.  A better question might be what was not required, and I'm

17   vary familiar with what was not required.

18   Q.  Okay.  You're refuting Angel Carbajal's testimony?  Is that

19   what you're here to do?

20   A.  I'm happy to tell you what was not required.  I don't

21   recall, four years ago, what Deputy Chief Carbajal said.

22   Q.  Now, you're not licensed and certified as a police officer

23   in Arizona, right?

24   A.  I am -- well --

25   Q.  Yes or no, sir?  If you are, you are.  If you're not,

1    you're not.

2    A.  I'm not certified as a state police officer.

3    Q.  Thank you.

4    A.  I am sworn as a federal officer and have jurisdiction in

5    the state of Arizona.

6    Q.  As a federal officer?

7    A.  Correct.

8    Q.  Okay.  We're talking about the state of Arizona, sir.

9    A.  Well, you didn't ask that.  That's why I gave you a full

10   answer.

11   Q.  Okay.  So as your role as an expert in this case, it's not

12   just to come in here and believe everything Lieutenant Ouimette

13   said, is it?  It's a yes-or-no question.

14   A.  My role is to take the information that I have available

15   and make a judgment and give an opinion as to the

16   reasonableness of force.  I can't answer a broad question like

17   to believe everything Lieutenant Ouimette has said.  Again, I

18   was not in the courtroom today.  I don't know how he testified.

19   Q.  But you know he didn't have his body-worn camera on, right?

20   A.  I don't believe so.

21   Q.  You don't know that?

22   A.  I don't believe so.

23   Q.  Okay.  Well, when you answer that, you act as though he may

24   have or he may not, you just don't know.  I'm asking you, do

25   you know that he --

1    A.  I have no -- I have no firm knowledge either way.

2    Q.  Huh.

3          When you continuously reference Lieutenant Ouimette as

4    the reasonably well-trained officer or the experienced,

5    well-trained officer -- which one do you say in your report?

6    Do you know?

7    A.  I actually don't use either of those statements, sir.  I

8    use something similar to the former.

9    Q.  I'm going to take you to page 7 of your report, where

10   you're talking about the pursuit.  And you can pick a section,

11   because it's everywhere in this report.  It says on page 7:  A

12   reasonable and well-trained officer would have pursued Hollins.

13         Right?

14   A.  Correct.  I do not say at any point in my report

15   experienced, well-trained or reasonably well-trained.  There's

16   quite a grammatical difference between "reasonably

17   well-trained" and "reasonable and well-trained."

18   Q.  And that's what I was asking you, for you to tell us what

19   you use, and now we got it.  "Reasonable and well-trained

20   officer" is your terminology, correct?

21   A.  That's correct.

22   Q.  Well, we know what well-trained means, right?

23   A.  I know what I believe well-trained means.

24   Q.  Why isn't Officer Spencer the reasonable and well-trained

25   officer in your analysis?

KEN WALLENTINE - CROSS-EXAMINATION

1   A.  I wasn't asked to evaluate Officer Spencer's actions in

2   this case, and so I really didn't opine at all on Officer

3   Spencer.

4   Q.  You did review enough Tempe Police documentation to know

5   that Officer Spencer was the first person to engage

6   Mr. Hollins, right?

7   A.  Yes, sir.

8   Q.  And you reviewed enough materials in this case to know that

9   Officer Spencer never pulled his gun out when he approached

10  Mr. Hollins, correct?

11  A.  That's my understanding.

12  Q.  And you know he never did any kind of felony stop where he

13  ordered him to the ground under gunpoint.  You know that,

14  right?

15  A.  That is my understanding.

16  Q.  And he never showed any other signs of fearing for his life

17  as he engaged Dalvin Hollins on the corner of Rural and

18  Guadalupe, right?

19  A.  That, I do not know.

20  Q.  Okay.  I want you to go to page 22, in your conclusion.

21          And you said you never gave an opinion about Officer

22  Spencer?

23  A.  Correct.

24  Q.  Well, in your conclusion, there goes Officer Spencer.

25  Right?

1    A.  Wrong.

2    Q.  Page 22 --

3    A.  Wrong.

4    Q.  -- first sentence of your conclusion.  You want me to read

5    it?

6    A.  Sure.

7    Q.  Under the circumstances observed by and reasonably believed

8    by Officer Spencer and Lieutenant Ouimette.

9            Do you see that?

10   A.  I do.

11   Q.  So you do reference Officer Spencer, and you say that

12   detaining and pursuing Hollins was reasonable.  Right?

13   A.  There are several places in my report that you'll see

14   Officer Spencer's name.  Again, I did not analyze or opine on

15   Officer Spencer's conduct.

16   Q.  Well, you just said that, in this report, that Officer

17   Spencer and Lieutenant Ouimette detaining and pursuing Hollins

18   was reasonable and consistent with generally accepted law

19   enforcement policies, dot, dot, dot.  Right?

20   A.  Fair enough.

21   Q.  That was one of your opinions.  And so what I'm asking you

22   is wouldn't Officer Spencer's actions, the ones he took in this

23   case, be the reasonable ones?

24   A.  Again, I was not asked to and did not opine on Officer

25   Spencer's actions, but insofar as what he did or didn't do,

1    that's not for me to say here today.

2    Q.  Did you review Officer Spencer's testimony, his deposition

3    testimony?  Can you look at your report, see if you reviewed

4    that?

5    A.  Yes.

6    Q.  You know that Officer Spencer didn't even know if Dalvin

7    Hollins was the Walgreens suspect when he encountered him on

8    Rural and Guadalupe, right?

9    A.  I don't believe that's true, but I do not know.

10   Q.  Well, if you don't know, why do you believe it's not true?

11   A.  Based on the fact that he had the same information about

12   the physical description, jumping on the counter, saying that

13   he had a gun, saying that he was a killer, seeing the shirt

14   that had been removed, and speaking to the suspect and having

15   the suspect flee, that's why.

16   Q.  But you don't remember what he said in his deposition,

17   right?

18   A.  It's been, again, four years.  I do not know what he said

19   in his deposition to give you chapter and verse here today.

20            MR. BURSH:  I'm sorry, Judge.  Can I walk up there?

21            THE COURT:  Go ahead.

22   BY MR. BURSH:

23   Q.  And when you get it, sir, I want to ask you to look at

24   page 106 of the deposition you say you already reviewed of

25   Officer Spencer.  Okay?

1          Do you have that deposition in front of you, or we

2     still looking?  I'm sorry.

3          Why don't I just ask you some other questions before

4     we get it.

5          When you were reviewing the Tempe police reports, did

6     you see where it looked like Officer Spencer was the first one

7     to start the chase and he dropped his radio or something like

8     that?  Did you see that?

9     A.   I recall that he began running and dropped his radio.

10    Q.   Do you have the deposition up now?

11    A.   There's no page 106 in this.  It goes to page 91.

12    Q.   I'm sorry, looks like we don't even have it.

13         Now, in any event, when Lieutenant Ouimette attempted

14    to use his vehicle to interfere with Dalvin Hollins' path as he

15    ran northbound through the parking lot at the Jack in the

16    Box/Leslie's Pools parking lot, did you read in the file where

17    Dalvin Hollins pushed off of the squad car that Lieutenant

18    Ouimette was driving with his hands?

19    A.   I don't -- I did recall him striking the car.  I don't

20    recall the words "pushed off," but I do recall what you're

21    referring to, yes.

22    Q.   And do you remember that Lieutenant Ouimette didn't see a

23    gun in Dalvin's hand?

24    A.   I believe that he did not see a gun in Dalvin's hand at

25    that point.

1    Q.  And your review of the file, you know that Dalvin Hollins

2    at that time was shirtless, right?

3    A.  I don't -- he didn't have a shirt on, correct.

4    Q.  And he was wearing sweats with a kind of elastic waistband?

5    Did you know that?

6    A.  I recall that they were sweatpants.  I do think they had

7    a -- yeah, a bunched-up, you know, elastic.

8    Q.  When a suspect is not wearing a shirt, does that make it

9    easier to see his torso?

10   A.  If the torso's presented frontally, sure.

11   Q.  Makes it easy to see what's around his waist?

12   A.  Well, it's easier to see what's in the upper part of the

13   visible portion of the torso, sure.

14   Q.  It even makes it easier to see his belt line, right?  Even

15   though he's not wearing a belt.

16   A.  Sure.  The part of the body that's exposed and is visible

17   is easier to be seen.

18   Q.  And so this chase onto Westchester, do you know that

19   various witnesses saw portions of the chase?

20   A.  I do.

21   Q.  Did you read Dawn Rice's deposition?

22   A.  I think I did in, I don't know, June or July of 2018.

23   Q.  Can you tell us anything significant that you remember when

24   you read her deposition?

25   A.  You know, rather than me pluck a line out that I think will

1    respond to you, why don't you -- if you can show me the

2    deposition.

3    Q.  I'm just asking if you remember anything significant to

4    your opinion about when you looked at it.

5    A.  At this point, I can't parse out what Dawn Rice said.

6    Q.  You reviewed Marlon Cruz's depo, right?

7    A.  I don't remember.  Was that his name?

8    Q.  I'm sorry, doesn't look like you reviewed Marlon Cruz's

9    deposition.

10   A.  I don't recall that name.

11   Q.  Did you review Walter Ramos's deposition?

12   A.  Yes, I did.

13   Q.  Okay.  So let's talk about Dawn Rice.

14            Do you remember if Dawn Rice said she saw Lieutenant

15   Ouimette running with a gun out in his hand after chasing

16   Dalvin Hollins?

17   A.  Again, sir, I don't have a clear recollection of what I

18   read in her deposition at this point.

19   Q.  And with Walter Ramos, do you remember whether Walter Ramos

20   testified in his deposition that Lieutenant Ouimette was

21   exhausted when he got to him in the middle of that parking lot

22   after he shot Dalvin Hollins?

23   A.  I don't.

24   Q.  Do you remember whether the witnesses said that Dalvin

25   Hollins was running as fast as he could?

1    A.  I think that someone might have opined on whether he could

2    run fast or not.  I don't recall who it was.

3    Q.  So with respect to this chase, you can't really tell us

4    much of anything other than what Lieutenant Ouimette says when

5    they got around the corner in front of the care center, right?

6    A.  I certainly can't tell you anything about the speed or

7    whether the suspect had exertional capacity that he hadn't

8    used, that is, was running as fast as he could.  I just, I

9    don't know.

10   Q.  And you can't tell us about the positioning of Lieutenant

11   Ouimette juxtaposed to the positioning of Dalvin Hollins when

12   they got around the corner in front of the care center, right?

13   A.  I'm not sure what you're referring to by the front of the

14   care center, but I'm familiar with the travel paths based on

15   the reports and based on going to the scene and going through

16   those travel paths and speaking with various persons there.

17   Q.  And based on everything you reviewed in this case and going

18   out there speaking to people, you can't tell us anything about

19   what really happened right there in front of that care center

20   when Lieutenant Ouimette shot Dalvin Hollins?

21   A.  Well, I certainly can tell you I was not present, so I'm

22   relying on the information that was provided to me by others.

23   Q.  And since nobody else saw that part of it, the only

24   information you're relying on with respect to what happened at

25   the moment that Lieutenant Ouimette shot Dalvin Hollins is

1   Lieutenant Ouimette, right?

2   A.  That and the physical evidence that was available to me and

3   the material that was reported to him.

4   Q.  What physical evidence?

5   A.  Well, the medical examiner, for example, the diagrams,

6   going to the scene and looking at the physical layout, the

7   parking lot, the building, the travel path.

8   Q.  I mean, what physical evidence did you see when you went

9   back to the scene?

10  A.  I saw cars.  I saw a parking lot.  I saw doors.  I saw a

11  building.  I saw a gravel pathway.  I saw a sidewalk.  I saw

12  the mailboxes.  I saw the laundry, the breezeway.

13  Q.  Why were you looking at doors?

14  A.  It was reported to me that the suspect tried to gain entry

15  into one of the buildings, the care center there, in what is a

16  sense the middle of the complex.

17  Q.  Do you know whether or not the suspect -- let me ask you,

18  since it was reported to you, do you know how he tried to gain

19  entrance?  What body part did he use to try to gain entrance?

20  A.  His hands, but I couldn't tell you exact motion.  I don't

21  remember.

22  Q.  In your review of the case and all the documents that were

23  provided to you, did you come across one fingerprint on any

24  door at Westchester to suggest that Dalvin Hollins ever touched

25  a door on this property?

1  A.  I don't know that any fingerprints were taken.

2  Q.  Exactly.

3       You didn't come here to offer an alternative reason, a

4  reason other than the reason given to us by Lieutenant

5  Ouimette, for why he shot Dalvin Hollins?  That's not why

6  you're here, right?

7  A.  I'm here to talk about the material presented to me and my

8  opinion as to the reasonableness of what Lieutenant Ouimette

9  did and its consistency with what we expect a trained officer

10 to do.  I'm not here to talk about what was in anyone's mind.

11 Q.  Okay.  So you're not here to justify Lieutenant Ouimette's

12 shooting of Dalvin Hollins?

13 A.  Insofar as that's a legal conclusion, I certainly am not.

14 Q.  Okay.  You said you read the medical examiner's report?

15 A.  Yes.

16 Q.  Did you ever read the report of Dr. Broadus Cooper?  Does

17 that name ring a bell?

18 A.  That name does not ring a bell, sir.

19 Q.  Okay.  In any event, have you looked at any materials that

20 discuss the manner in which Dalvin Hollins died?

21 A.  If you're referring to the manner in terms of how a medical

22 examiner would describe it?

23 Q.  What happened to him in that shed is what I'm talking

24 about.  Did you read anything about that?

25 A.  I'm aware of what happened in the shed generally.  I'm not

1    a doctor, so I can't -- I can't give you really much

2    information about, you know, the medical or the physiology of

3    it.

4    Q.  Well, let's talk about it.

5                MR. STRUCK:  Your Honor, object to foundation and

6    relevance to this witness.

7                THE COURT:  I'm trying to understand.  Are you --

8                MR. STRUCK:  Well --

9                THE COURT:  Are you saying this is beyond the scope of

10   your cross-examination?

11               MR. BURSH:  No.

12               MR. STRUCK:  Well --

13               THE COURT:  Direct examination, I mean?

14               MR. STRUCK:  No, I'm not -- well, it is the beyond the

15   scope of my direct examination.

16               MR. BURSH:  No, it's not.

17               MR. STRUCK:  But what I'm saying is he's asking him

18   medical opinions, and he's not a medical doctor.  He just said

19   he didn't know.  And it's not relevant to the opinions with

20   respect to use of force.

21               THE COURT:  I don't recall this being a subject

22   covered in direct, and that's what I'm wondering about.

23               MR. BURSH:  Well, yeah, Judge.  They talked about the

24   response.  They went on about how long it took for all of this

25   stuff to get in place to take care of the people at

1  Westchester.

2        THE COURT:  Okay.

3        MR. BURSH:  I believe he even testified --

4        THE COURT:  I see where you're going with that, but

5  I'm wondering -- I'm not sure, what is it you're trying to get

6  out of him?

7        MR. BURSH:  He reviewed it.  He just told us he

8  reviewed the medical examiner's report.  The medical examiner

9  talked about how he died.

10        THE COURT:  Okay.  Well, why don't you ask him

11  specifically what -- your questions are so -- it's vague, and

12  I'm not sure he even understands what you're asking.  I don't

13  understand.  So why don't you ask him specifically -- ask a

14  leading question so he can answer yes or no.

15        MR. BURSH:  Okay.  Thank you.

16  BY MR. BURSH:

17  Q.  You reviewed the medical examiner's report?

18  A.  I did.

19  Q.  So you must have seen in the medical examiner's report

20  where it was discussed how he died in the shed?

21  A.  I may have.  That certainly wasn't what I was looking for

22  in the medical examiner's report, but that -- I may well have

23  seen that.

24  Q.  And, in essence --

25  A.  It's possible.

KEN WALLENTINE - CROSS-EXAMINATION

1   Q.  And, in essence, he died by suffocation on his own blood.

2   Did you see that?

3          MR. STRUCK:  Objection, Your Honor.  Counsel's

4   testifying.

5          THE COURT:  He's leading.  That's a leading question.

6          Overruled.  Go ahead.

7   BY MR. BURSH:

8   Q.  Did you see that?

9   A.  I don't believe so.  I don't believe that's there, but I

10  don't know.

11  Q.  Did you see anywhere in any of the evidence that you

12  reviewed where Lieutenant Ouimette told any of his fellow

13  officers at the scene that Dalvin was armed and had pointed a

14  gun at him?  Anywhere?

15  A.  At the scene?

16  Q.  At the scene.

17  A.  Not that I recall.  That came later.

18  Q.  Since you're an expert, I want to give you a hypothetical.

19  Okay?

20  A.  Sure.

21  Q.  What if Lieutenant Ouimette made a mistake and shot Dalvin

22  in the back partially because he had not done his judgmental

23  training?  Would you then think an officer in Ouimette's

24  position would have an incentive to tell a non-truth?

25          MR. STRUCK:  Objection, Your Honor.  Compound.

1    Foundation.  Calls for speculation.

2          MR. BURSH:  It's a hypothetical.

3          THE COURT:  I don't think you need an expert witness

4    to ask this question.  That's not -- doesn't call for an expert

5    opinion, so why don't you use him for expert issues.  That

6    doesn't help the jury.  The jury can make that determination

7    themselves.

8          MR. BURSH:  Thank you, Your Honor.

9    BY MR. BURSH:

10   Q.  Where in your report do you consider that Lieutenant

11   Ouimette may not be telling the truth?

12   A.  If you're asking did I write in my report, "Lieutenant

13   Ouimette may not be telling the truth," I did not.

14   Q.  If Lieutenant Ouimette was not a police officer and he gave

15   you the story that he's given in this case, would you have

16   believed him?

17         MR. STRUCK:  Objection, Your Honor.  Foundation.

18   Argumentative.  Speculation.

19         THE COURT:  I'm going to sustain that.  You're asking

20   him to comment on the credibility of another witness.

21         MR. BURSH:  I think I was asking him to comment on the

22   credibility of the other witness's story, which he based his

23   opinion on.

24         THE COURT:  I don't see the difference.  I'm going to

25   sustain the objection.

1           MR. BURSH:  Okay.  Thank you, Judge.

2    BY MR. BURSH:

3    Q.  By the way, since you've been investigating and you've been

4    a police officer for many years, do you think there's a

5    distinction between "no gun found" and "unarmed"?

6    A.  Yes.

7    Q.  What's the distinction?

8    A.  If a report reaches the conclusion that there is no gun

9    found, there has been no gun found.  If a report uses the term

10   "unarmed," whoever wrote that report is expressing their belief

11   that the person did not have a weapon at the time -- well, I'm

12   assuming, and I'm assuming a lot for your very broad

13   hypothetical, that at the time that force was used, the person

14   was unarmed.

15           That's my understanding of the meaning.  Others may

16   see it differently.

17   Q.  Have you ever done an investigation where it was -- there

18   was no gun found, and then six years goes by and there's still

19   no gun found?  Do you ever amend your report to say or to

20   conclude that the suspect was just unarmed?

21   A.  I'm trying to think whether I've ever amended a report

22   after six years.  I think I have not.

23   Q.  Okay.  In your experience, have you ever reopened an

24   investigation six years later because there is a new finding?

25   A.  What sort of filing?

UNITED STATES DISTRICT COURT

1    Q.  Finding.  Finding.

2    A.  Oh.  And, again, I would ask, what sort of finding?  In

3    my --

4    Q.  Any kind of finding.  More evidence.  New evidence.

5            MR. STRUCK:  Objection, Your Honor.  The question is

6    vague.  I'm not sure what kind of investigation counsel's

7    asking the witness.

8            THE COURT:  Overruled.  He can answer it.

9            THE WITNESS:  I have not.

10   BY MR. BURSH:

11   Q.  Now, you talked about the idea that a suspect can turn

12   180 degrees in a third of a second, right?  It's possible is

13   what you're saying, right?

14   A.  What I said was that there has been some solid research on

15   that issue, repeated a number of times, and that the research

16   shows that a person can rotate 180 degrees in one-third of a

17   second, .33 seconds.

18   Q.  And you base that testimony on studies performed by

19   Lewiski, right?  Is that his name?

20   A.  It's not, but that's not --

21   Q.  What is his name?

22   A.  -- terribly far off.

23   Q.  What's his name?

24   A.  Dr. Bill Lewinski is the author of one study I've read.

25   I've also examined the work of Dr. John --

1          MR. BURSH:  Objection, Your Honor.  We're only here to

2    talk about a study, one study.

3          THE COURT:  Hang on a second.  He's entitled to talk

4    about any studies that were disclosed in his report upon which

5    he bases his opinion.  And that's --

6          MR. BURSH:  One -- one Lewinski study.  I don't know

7    where he's going with the other study.

8          THE COURT:  I don't know.  I'm just saying, if his

9    report doesn't indicate there are other studies, then he is not

10   allowed to go into any other studies that haven't been

11   disclosed as the basis of his opinion.

12   BY MR. BURSH:

13   Q.  I'm talking about the study that you referenced in your

14   report by Lewinski.

15   A.  Yes.  That is one of the studies, plural, that I

16   referenced, by one PhD among, I think there's probably a dozen

17   that I've cited in my report.

18   Q.  But Lewinski is the one whose study is entitled "Why the

19   Suspect is Shot in the Back."  Right?

20   A.  Of the probably 50 studies that Dr. Lewinski has published

21   in various journals, that is the title of one, yes.

22          THE COURT:  I just -- I want to make clear, you

23   understand, if there are other studies that you're aware of

24   that you didn't reference in your report, you're not allowed to

25   go into those.

1            THE WITNESS:  Correct.

2            THE COURT:  Okay.  So I don't know what's in the

3    report, but --

4            MR. BURSH:  Thank you.

5            THE COURT:  -- I just want to make it clear that what

6    we're talking about is the same thing.

7    BY MR. BURSH:

8    Q.  Now, you know that Lewinski has come under heavy criticism

9    by people who disagree with his hypotheses that he expresses in

10   his studies, don't you?

11   A.  I know that you've said that.

12   Q.  Well, I'm not the only one.  The New York Times criticized

13   him in 2015 when they did an article saying that he was

14   training officers to shoot first.  You don't know that?

15   A.  I do not.

16   Q.  Okay.  The Justice Department denounced his findings as

17   lack of both foundation and reliability.

18           You work for the Justice Department.  You didn't know

19   that?

20           MR. STRUCK:  Objection, Your Honor.  If counsel could

21   refer to what he's reading from.

22           MR. BURSH:  I just talked about the New York Times

23   article by Matt Apuzzo, August 1, 2015.

24   BY MR. BURSH:

25   Q.  You weren't aware of that?

1    A.  It's not anything I've read.

2    Q.  In that same article, he found that the Justice Department

3    denounced Dr. Lewinski's findings as lack of both foundation

4    and reliability.  You didn't know that?

5    A.  I'm sure that the reporter said something, but that's not

6    my experience working with the Justice Department and working

7    with Dr. Lewinski.

8    Q.  Okay.  Isn't it true --

9           MR. STRUCK:  Your Honor, defense object.  We would

10   request at least a copy of the article from which counsel is

11   reading, which we have not received.

12          MR. BURSH:  And, Judge, I never got a copy of anything

13   they asked Hynes about.

14          THE COURT:  I'm sorry.  You what?

15          MR. BURSH:  I never got a copy of anything that they

16   asked Dr. Hynes about when they were questioning him.

17          THE COURT:  Well, Dr. Hynes is long gone.

18          Do you have an article that you're reading?

19          MR. BURSH:  I'm reading from notes that I took from

20   the article.

21          THE COURT:  Where is the article?

22          Let counsel see it.  I don't need to see it.

23          MR. BURSH:  There's a number of them.

24          THE COURT:  The article you're referring to when

25   you're asking questions.

UNITED STATES DISTRICT COURT

1          MR. BURSH:  They're all there.

2          THE COURT:  Okay.

3   BY MR. BURSH:

4   Q.  Are you familiar with Lisa Fournier?  Have you heard that

5   name?

6   A.  It does not ring a bell.

7   Q.  She's a professor at Washington State University and an

8   editor for the American Journal of Psychology.  Never heard of

9   her?

10  A.  Gosh, that name does not ring a bell, even now.

11  Q.  Well, she's offered the opinion that Lewinski's work lacks

12  basic elements of legitimate research.  Did you know that?

13  A.  I know you're saying that.

14  Q.  Well, I'm reading it.  She called it pseudoscience.  Did

15  you know that?

16  A.  My answer remains the same.  I don't know who this woman

17  is.

18  Q.  Called the studies unreliable.  You didn't know that?

19  A.  I don't know who she is.

20  Q.  Okay.  Do you know if there's a Washington Post article by

21  Radley Balko that says that the LAPD canceled training with

22  Lewinski?

23          Do you know that?

24          MR. STRUCK:  Your Honor, again, I don't have an

25  article.  I have not been provided an article.

1          MR. BURSH:  You have that.

2          MR. STRUCK:  It's not in here.

3          THE COURT:  Mr. Bursh, do you have a copy for counsel?

4          MR. BURSH:  I gave it to him.  They're all in there.

5     He just hadn't gotten to it yet.

6          THE COURT:  Well --

7          MR. BURSH:  I'll move on.  I think I've got the point

8     across.

9          MR. STRUCK:  Move to strike.

10         THE COURT:  Sustained.

11    BY MR. BURSH:

12    Q.  Isn't it true, sir, at the end of the day, there's no

13    physical evidence to suggest that Lieutenant Ouimette was under

14    deadly attack at Westchester on July 27th, 2016?  Yes or no?

15    A.  Can't answer that yes or no.

16    Q.  Okay.

17    A.  But the answer would be no the way you asked it.

18    Q.  And the things that you've reviewed to offer an opinion --

19    strike that.

20         And the opinions you've offered in this case presume

21    that Lieutenant Ouimette was telling the truth when he told you

22    and he told us how he shot Dalvin Hollins, correct?

23    A.  Correct.  I believe he was telling the truth.

24         MR. BURSH:  Give me one second.

25         I'm done, Your Honor.

```
 1              THE COURT:  Redirect?

 2              MR. STRUCK:  Yes, Your Honor.

 3                      REDIRECT EXAMINATION

 4  BY MR. STRUCK:

 5  Q.  Mr. Wallentine, counsel asked you several questions

 6  regarding the fact that a gun was not found.

 7              Do you recall that?

 8  A.  Yes, I do.

 9  Q.  With respect to your opinion in this case, does it make a

10  difference that a gun was not found?

11  A.  Not at all.

12  Q.  And can you explain that, please.

13  A.  Sure.  My task in this case and every other

14  officer-involved shooting that I've ever investigated is to

15  make an assessment of the officer's conduct and measure whether

16  that conduct is consistent with training that we expect out of

17  officers in similar circumstances.

18              And in this case, it was critical to me that the

19  circumstances, the information known to Lieutenant Ouimette,

20  were entirely consistent with a suspect aiming a gun at him and

21  for Lieutenant Ouimette to believe that he was about to be

22  killed.

23  Q.  And in terms of whether or not there was physical evidence

24  of a gun, that makes no difference with respect to this

25  analysis regarding reasonable use of force?
```

1    A.  I can't say that it wouldn't be, you know, nice to have.

2    But in terms of my task and what I do in every investigation,

3    no, it doesn't make a difference.

4    Q.  Can there be situations, Mr. Wallentine, in which the force

5    was determined to be reasonable when an officer was mistaken

6    regarding whether or not the individual he was using deadly

7    force on had a gun or not?

8             MR. BURSH:  Objection, Your Honor.  Assumes facts not

9    in evidence.

10            THE COURT:  I think he can ask the question.  Just

11   rephrase it, though.

12            MR. STRUCK:  Sure.

13   BY MR. STRUCK:

14   Q.  Can there be situations in which an officer reasonably

15   believes that the individual upon -- that is pointing and

16   making a shooting gesture utilizes deadly force and that can

17   still be reasonable, even though he made a mistake as to what

18   was in his hand?

19            MR. BURSH:  Objection, Your Honor.  That is not the

20   facts in evidence.  There's been no talk about a mistake.

21            THE COURT:  Overruled.

22            THE WITNESS:  Yes.  That happens.

23   BY MR. STRUCK:

24   Q.  Can you explain that?

25   A.  While we would always hope for perfection -- in all humans,

1    but in our police officers -- officers have to make judgments

2    every day, as do all of us, based on what they perceive, based

3    on information provided to them.

4            So as I've said several times, Mr. Struck, in this

5    case, I believe that Lieutenant Ouimette made a reasonable

6    decision based on what he knew at the time and compared to how

7    we train police officers and expect them to behave in that

8    particular situation.

9    Q.  Counsel asked you a question about deescalation.

10           Do you recall that?

11   A.  I do.

12   Q.  Was there an opportunity in this instance for there to be

13   deescalation?

14   A.  There was not.

15   Q.  Why not?

16   A.  Deescalation requires at least two willing participants.

17   It requires, at the very -- at the very, very minimum, a

18   communication connection made between the officer and the other

19   person.  It requires an opportunity for the other -- the

20   officer to try and persuade the other person to deescalate,

21   that is, to defuse their emotions or to cooperate in some

22   fashion.  There just wasn't an opportunity here.

23   Q.  What's a dynamic situation?

24   A.  A dynamic situation is one that is rapidly changing,

25   rapidly unfolding.  It's uncertain.

1    Q.  How would you define the situation that was confronted by

2    Lieutenant Ouimette?

3    A.  I would say that this was a very tense, very dynamic, very

4    rapidly evolving and very uncertain circumstance.

5    Q.  There were several questions with respect to your report

6    and the 19 minutes it takes to walk from the Walgreens down to

7    the Jack in the Box where Mr. Hollins was encountered by

8    Lieutenant Ouimette and Officer Spencer.

9            Do you remember that?

10   A.  Yes.

11   Q.  What, in your report, were you trying to -- what was the

12   point you were trying to get across in your report?

13   A.  It was really pretty simple, that it was reasonable to

14   believe that that man there standing with the black bag and the

15   clothing that, other than the removal of the shirt, matched,

16   that it is very reasonable to believe that he was the suspect,

17   that it was humanly possible for him to move from Point A, the

18   scene of the armed robbery, to Point B, the Jack in the Box, in

19   19 minutes.

20   Q.  So if, say, it was 15 miles away within 19 minutes and they

21   encountered Mr. Hollins, would you have a different opinion?

22   A.  Yeah.  If it was 15 miles away, even Usain Bolt couldn't

23   have made that distance, not on foot.  Somebody could have

24   picked him up, but no.

25   Q.  And based on the information that you reviewed, were you --

1    did you receive any information that Mr. Hollins -- with

2    respect to Mr. Hollins' path from the Walgreens to the Jack in

3    the Box?

4    A.  Yes.

5    Q.  Did he walk a straight line down --

6    A.  Not --

7              MR. BURSH:  Objection.  Objection.  Leading.

8              THE COURT:  Overruled.

9              THE WITNESS:  The information that I was provided was

10   that he did not.  I went -- was taken by one of the officers

11   along the path that the evidence showed he traveled.  I'm

12   sorry, I've forgotten the name, but there's a big high school.

13   I mean, it was a really big facility.  I can't remember.  I'm

14   sorry.

15             But, no, he didn't.  Based on what I've been told, he

16   did not take a perfectly linear, uninterrupted path from the

17   Walgreens.

18   BY MR. STRUCK:

19   Q.  When you're talking about the big high school, what did

20   Mr. Hollins do with respect to his path of travel?

21   A.  He zigged and he zagged.  He was -- it looked to me, based

22   on what I understood, that he was doing something we see

23   suspects do all the time, and that's, you know, you find a

24   hidey-hole and get someone to come and get you.  That was my

25   understanding.

KEN WALLENTINE - REDIRECT EXAMINATION

1    And that would be consistent with what I've seen in

2  many, many cases where suspects flee on foot.

3  Q.  Was there any other information in the police report with

4  respect to what Mr. Hollins was doing on the Marcos de Niza

5  campus that helped you reach your conclusion that he was trying

6  to get picked up?

7  A.  There were some cell phone analytics of calls and text

8  messages.

9  Q.  Counsel asked you questions regarding the testimony of

10  Lieutenant Ouimette.

11    Do you remember that?

12  A.  Be more specific.

13  Q.  Sure.

14  A.  Please.

15  Q.  About the trial testimony of Lieutenant Ouimette regarding

16  why he fired his gun --

17  A.  Right.

18  Q.  -- at Mr. Hollins.

19  A.  Correct.

20  Q.  And you were not in the courtroom when he made -- when he

21  testified?

22  A.  I was not.

23  Q.  With respect to the information that you reviewed, all of

24  the information you reviewed, what were the reason -- what was

25  the reason why Lieutenant Ouimette fired his gun at

1  Mr. Hollins?

2          MR. BURSH:  Objection, Your Honor.  Foundation.  I

3  think when I was asking questions, he didn't know.  Now he

4  knows.

5          THE COURT:  I think when you were asking questions, he

6  was assuming you were limiting your question to the courtroom

7  testimony.  This question asks for him to consider all the

8  testimony he's considered, even outside the courtroom.  So I

9  think that's the difference.

10          MR. BURSH:  Thank you, Your Honor.

11          THE COURT:  Overruled.

12          THE WITNESS:  He believed, Lieutenant Ouimette

13  believed, at the time that he used deadly force, that he was

14  about to die, that he was about to be shot, that he was about

15  to be killed.

16  BY MR. STRUCK:

17  Q.  And what information did he have at that time for him to

18  have that belief?

19  A.  He had information that an armed robbery had occurred; that

20  a person said, "I'm all about killing, I'm a killer"; that that

21  person said he had a gun; that he had seen a person who had

22  apparently fled from that location and then fled from him, who

23  had a large black satchel or bag that easily, easily could have

24  contained a gun or two or three; and that the suspect made

25  physical movements consistent with drawing and aiming a weapon

1   that would lead a reasonable officer to believe, "I'm about to

2   die.  I'm about to be shot."

3   Q.  Counsel asked you several questions about judgmental

4   training.

5          Do you remember that?

6   A.  I do.

7   Q.  And just wait a moment before you answer the next question.

8          Counsel asked you whether or not it was a good idea

9   that Lieutenant Ouimette missed his judgmental training.

10         Do you remember that question?

11  A.  I do.

12  Q.  And please hesitate, because I think we're going to have an

13  objection.

14         Why did it not make any difference in this case that

15  Lieutenant Ouimette missed that judgmental training?

16         MR. BURSH:  Objection, Your Honor.  That opinion has

17  not been disclosed.

18         MR. STRUCK:  Your Honor, he opened the door, and it

19  has been disclosed.

20         MR. BURSH:  No.  That wasn't in his report.

21         THE COURT:  Show me where it's disclosed.

22         MR. STRUCK:  In his prior testimony, Your Honor.

23         THE COURT:  Okay.  Sustained.

24         You're talking about -- not in his deposition, though,

25  right?

1      MR. STRUCK:  That is correct.

2      THE COURT:  If it was in his deposition, then I'll

3  take it as disclosure.

4      MR. STRUCK:  Okay.  He was not deposed.

5  BY MR. STRUCK:

6  Q.  He also asked you about Officer Spencer not -- when he

7  first confronted Mr. Hollins in the parking lot of the Jack in

8  the Box, he wasn't sure whether he was the suspect or not.

9      Do you remember that?

10  A.  Correct.

11  Q.  Do you remember what Officer Spencer's opinion was once

12  Mr. Hollins took off running?

13  A.  He thought that he had found -- that he had identified the

14  armed robbery suspect.  He began to chase him.

15  Q.  Counsel asked you some questions regarding

16  perception-reaction time and whether individuals had criticized

17  the concept of perception-reaction time.

18      Do you remember that?

19  A.  I do.

20  Q.  Are you aware of any peer review studies where anyone has

21  come up with information that's contrary to the theory of

22  perception-reaction time with respect to use of force?

23  A.  I am not.

24  Q.  You mentioned in your report two studies, one by

25  Mr. Lewinski, "Why is a Suspect Shot in the Back."  You're

1    familiar with that?

2           And if you want to look at it, it's on page 10 of your

3    report.

4    A.  I am familiar with that article by Dr. Lewinski, yes.

5    Q.  Who is Dr. Lewinski?

6    A.  Dr. Lewinski is the -- I believe his title is executive

7    director of the Force Science Institute, which is a research

8    institute based in Chicago, Illinois, and is the home to a

9    number of -- there are a number of PhDs who do work with the

10   institute and a number of PhD students working on dissertations

11   there.

12   Q.  And then in your report, you also refer to another article,

13   "The Speed of a Prone Subject in the Law Enforcement Executive

14   Forum 2016."

15          Do you remember that?

16   A.  Correct.

17   Q.  And what is the Law Enforcement Executive Forum?

18   A.  It is a -- I think the best way to describe it would be a

19   publication of a law enforcement think tank.  It -- you know,

20   there are a lot of trade magazines, a lot of police magazines,

21   but this is a -- it's a scholarly peer-reviewed group

22   administered by a board of editors that assign articles out for

23   peer review in different disciplines.

24   Q.  And was it -- who were the other authors of the study?

25   A.  There's some that I know personally.  Dr. Seefeldt, who now

1   I believe is using a married name, Dr. -- I think it's -- her

2   husband's Dr. John.  Oh, heavens.  She was one of my

3   professors.  Dr. Jen Dysterheft, I do know her and have

4   attended lectures.  I do not know Dr. Sargent or Dr. Redmann,

5   and I cannot recall whether -- I don't recall whether Dr. Gonin

6   had achieved a PhD at that particular point.

7          But these are -- these are researchers in the field

8   of -- Dr. Seefeldt in psychology, Dr. Dysterheft in psychology

9   and human factors, kinesiology.  I don't recall the discipline

10  of the other academics who were involved in that.  There was a

11  total of six authors in that study.

12  Q.  And what year was that study?

13  A.  That was 2016.

14  Q.  And that was a peer-reviewed study?

15  A.  That was a -- yes.  Very heavily so.

16  Q.  And I think that was after the New York Times article

17  that -- I think he said it was --

18  A.  I've never seen that article, so I don't -- if the New York

19  Times thing was in 2015, yes, this would have been a year

20  later, at least.

21  Q.  And plaintiffs' expert, Dr. Hynes, he testified that he

22  agrees with the concept of perception-reaction time.  You

23  wouldn't disagree with Dr. Hynes, would you?

24  A.  I'm aware of Dr. Hynes speaking about this very issue and

25  saying very much things very consistent with what I've said in

 1    this case and others.

 2    Q.  Counsel asked you a question -- and please hesitate before

 3    you answer.  Counsel asked you a question regarding the

 4    judgmental training in Utah.

 5              Do you remember that?

 6    A.  Yes, sir.

 7    Q.  And you answered some questions regarding the judgmental

 8    training in Utah.

 9    A.  I did.

10    Q.  And here's my question:  Is judgmental training in Utah

11    mandatory?

12    A.  It is not.

13    Q.  Thank you.

14              In your opinion, Mr. Wallentine, was the use of force

15    in this situation utilized by Lieutenant Ouimette reasonable

16    under the circumstances?

17              MR. BURSH:  Objection.  Asked and answered.

18              THE COURT:  Sustained.

19    BY MR. STRUCK:

20    Q.  Do you have an opinion with respect to whether the use of

21    force was justified?

22              MR. BURSH:  Objection.  Asked and answered.

23              MR. STRUCK:  Your Honor, it's my last question.

24              THE COURT:  That is the ultimate issue for this jury

25    to decide.  Sustained.

1        MR. STRUCK:  Well, he already -- Your Honor, he --

2        THE COURT:  Okay.  We're done.

3        MR. STRUCK:  All right.  No more questions.

4        THE COURT:  Okay.  Go ahead.

5        Are you done?

6        MR. STRUCK:  Yes, Your Honor.

7        THE COURT:  Okay.

8        All right.  You may step down.

9        (Witness excused.)

10        (Further proceedings held on the record not

11   transcribed herein.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  C E R T I F I C A T E

2

3           I, JENNIFER A. PANCRATZ, do hereby certify that I am

4    duly appointed and qualified to act as Official Court Reporter

5    for the United States District Court for the District of

6    Arizona.

7           I FURTHER CERTIFY that the foregoing pages constitute

8    a full, true, and accurate transcript of all of that portion of

9    the proceedings contained herein, had in the above-entitled

10   cause on the date specified therein, and that said transcript

11   was prepared under my direction and control.

12          DATED at Phoenix, Arizona, this 12th day of March,

13   2022.

14

15

16

                         s/Jennifer A. Pancratz_____
17                       Jennifer A. Pancratz, RMR, CRR, CRC

18

19

20

21

22

23

24

25